

Opinions of the United
States Court of Appeals
for the Third Circuit

2006 Decisions

2-14-2006

# In Re: Ariel Adan

Precedential or Non-Precedential: Precedential

Docket No. 05-3045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Ariel Adan " (2006). *2006 Decisions*. Paper 1504.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1504

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-3045
_____


IN RE: APPLICATION OF ARIEL ADAN


ELENA ESTHER AVANS,

Appellant

_____


Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 04-cv-05155)
District Judge: Honorable William H. Walls

_____


Argued September 29, 2005

Before: ALITO* and AMBRO, <u>Circuit Judges</u>
RESTANI,** <u>Judge</u>

(Opinion filed:  February 14, 2006)

Elliot H. Gourvitz, Esquire (Argued)
150 Morris Avenue
P.O. Box 476
Springfield, NJ 07081

       Counsel for Appellant

Walter A. Lesnevich, Esquire (Argued)
Francesca Marzano-Lesnevich, Esquire
Michael R. Mildner, Esquire
Lesnevich & Marzano-Lesnevich
21 Main Street,
Court Plaza South
Hackensack, NJ   08601

       Counsel for Appellee

---

*Then Judge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006.  The opinion is filed by a quorum of the panel.  28 U.S.C. § 46(d).

**Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

## OPINION OF THE COURT

AMBRO, Circuit Judge

Elena Esther Avans[1] appeals from an order of the United States District Court for the District of New Jersey granting appellee Ariel Adan's application for return of his daughter Arianna to Argentina pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (1980). Avans asks us to reverse the District Court's order and dismiss the application. For the reasons stated below, we vacate the District Court's order and remand for further proceedings consistent with this opinion.

## I.

The factual background of this case is troubling. We say this not only because of the ominous accusations of abuse that have been directed at Adan, but also because the record on appeal is woefully incomplete. The parties' submissions to our

---

[1] In her brief, Avans refers to herself as "Elena Esther Mazza." Because she has not made a motion to amend the official caption of this case to reflect a change in name, we shall refer to her as "Avans" in this opinion.

Court are of little help in piecing together the chain of events at issue, and the District Court did not make detailed, written findings of fact to assist us. The facts and procedural history stated herein, therefore, are taken from the District Court record, including transcripts and filings, and (to the extent they are helpful) the parties' submissions to this Court.

## A. **Background**

Avans is a naturalized U.S. citizen and former girlfriend of Adan, a citizen of Argentina. The parties met in Argentina in 1998 at a support group for recovering drug and alcohol abusers and began cohabiting shortly thereafter. According to Avans' testimony before the District Court, Adan became violent shortly after Avans moved in with him. She alleges that Adan locked her in his bedroom, beat her, and threatened her with further harm if she ever left him. In 1999 Avans became pregnant by Adan. In March 2000, while she was still pregnant, Avans came to the United States and began living in New Jersey. Adan followed her in April 2000 and (according to Avans) the abuse resumed. She contends that Adan tried to suffocate her with a pillow, and she filed a report with the Roselle, New Jersey police department alleging that he "picked up two laundry bags and threw them over her head." Avans gave birth to Arianna on June 15, 2000.

The parties lived in New Jersey for the next three months. Avans alleges that during this time the abuse continued,

including Adan's threats to drown the child if Avans ever left him. She filed another report with the Roselle police on June 30, 2000 alleging that Adan pushed her while holding Arianna and, when Avans left to walk to the police station to file a report, Adan drove after her and told her to return home because he had left Arianna alone. In September, Adan announced that he wanted Avans and Arianna to return with him to Argentina. According to Avans, Adan knelt next to Arianna's crib and screamed in the child's ear until Avans finally agreed to his demand. On September 15, 2000 the parties and their daughter returned to Argentina.

Avans contends the abuse got worse while she was in Argentina, including an incident in March 2002 when Adan allegedly threatened Avans and Arianna with a gun, another incident from the same month when Avans claims Adan hit her at a birthday party, and a later incident when Adan purportedly chained the gate to Avans' home shut so she could not get out. Throughout these incidents, Avans contends that she repeatedly sought the assistance of the Argentine police and court system but they did nothing, which she attributes to bribes Adan allegedly paid to police and judges. Avans eventually began living apart from Adan, and the parties reached an informal custody agreement regarding Arianna. Aside from short visits to the United States in May 2001 and May 2003, Avans and Arianna remained in Argentina.

Avans alleges that Adan began sexually abusing their daughter in 2003. Specifically, she contends that in June 2003 she discovered a pubic hair in her daughter's vagina, which Adan attributed to Arianna being in a dirty bed. Avans also contends that on several occasions Arianna would return from visits with her father, sometimes after having been gone for only a few hours, with wet hair. The child allegedly told her mother that Adan took baths with her and "loves [her] with his tongue," whereupon the child showed her mother that Adan apparently had kissed her and put his tongue inside her mouth. Avans also alleges that her daughter said that Adan "was putting something hot in her butt" that hurt. In addition, Avans alleges Adan pushed Arianna so hard that she vomited, and then proceeded to rape Avans in front of Arianna.

After these incidents, Avans went to family court in Argentina, accompanied by her landlord and neighbors, and filed a complaint against Adan that resulted in a 90-day temporary restraining order against him. According to Avans, Adan violated the restraining order and the police would not enforce it. Shortly before the February 2004 return date on the temporary restraining order, Avans brought her daughter to the United States.

Adan agrees with Avans' chronology of their relationship but contests her allegations of abuse. He contends that Avans was under the influence of drugs and could not take care of Arianna. He states that he paid all expenses related to Arianna's

6

care and upbringing in Argentina, and denies having ever raped Avans or bribed police officers or judges. He also denies having sexually assaulted Arianna or abusing Avans, although the transcript of his hearing testimony reveals that he did not specifically deny particular acts of abuse. He admits using marijuana and alcohol while he lived with Avans, but states that she used them as well. His brief before our Court dismisses Avans' remaining allegations as "gossip that is irrelevant to the issues at bar." Appellee's Br. at 6.

## B. <u>Legal Proceedings in the United States</u>

Adan eventually traced a Western Union wire transfer to Avans and discovered she and Arianna had returned to New Jersey. Although the record is unclear on the precise date, Adan came to New Jersey sometime in the spring of 2004 looking for his daughter. In April 2004 Avans obtained a temporary restraining order against Adan from the Superior Court in Union County, New Jersey. Adan filed the application that is the subject of this appeal in the United States District Court for the District of New Jersey in October 2004.

The District Court held a hearing on June 6 and 7, 2005, at which it heard testimony from Avans and Adan consistent with the factual background recounted above. At this hearing, the Court also learned that Adan had filed a criminal complaint against Avans in Argentina for kidnaping Arianna, and that the Argentine authorities had issued a warrant for her arrest and

were seeking extradition. The Court also heard testimony from Avans that Arianna had been seeing a therapist in New Jersey regarding sexual behaviors the child had exhibited, and received into evidence a photograph that Adan took of Arianna and sent to Avans in which the girl is wearing her underwear over her head like a mask.

On June 7, 2005 the District Court issued a one-sentence order granting Adan's petition for return of the child and ordering Avans to return Arianna to Argentina immediately. Although the Court made no formal written findings of fact, the District Judge did make some oral comments regarding the credibility of the witnesses and their testimony in the course of announcing his decision. He concluded that "the respondent [Avans] is a little more credible" than Adan and that "the petitioner [Adan] lied or was not being truthful when he denied that he had ever verbally threatened [Avans] or abused her, if we use that term in the context of verbal abuse." The Court described Adan as

> effusive and just running all over the field in giving answers to questions which did not deal with [the alleged abuse]. But when he was asked those questions [related to the alleged abuse], he sort of more or less clammed up and gave us very bald, sterile [answers,]

8

which was great[ly] at odds with the . . . man whom I saw constantly running off at the mouth, to use the vernacular, on the stand in a very hyper manner, which is quite consistent with the manner in which he is portrayed by the respondent [and is] not inconsistent with what she claims he did.

Nonetheless, the District Court concluded that Avans had not demonstrated by clear and convincing evidence that Arianna would be subject to physical or psychological harm if returned to Argentina, as required by the Convention. With respect to the allegations of sexual abuse, the District Judge concluded that Arianna's statement that her father "was putting something hot in her butt" that hurt was "no proof whatsoever of sexual abuse [because] [t]hat can be anything."[2] As for Avans' discovery of a pubic hair in Arianna's vagina, the Judge found "that without anything else means nothing, particularly since there has been no evidence . . . of having [the] child readily examined by a competent medical person to determine whether there had been true sexual abuse or whether, as the petitioner says, the child had

_____

[2] During the hearing, the Judge interrupted Avans' testimony on this issue, stating that "as a parent and a grandparent that can mean a lot of things . . . so I don't know what that means. . . . [T]hat means nothing to me."

9

been lying on a dirty bed." The Judge also did not place much reliance on Arianna's statement that her father "love[d] [her] with his tongue," finding the statement "not significant because . . . it's not unusual in this country at least for parents and grandparents to at times in playing with young toddlers to kiss them with tongues on the cheeks and then sometimes the tongue may have gone too far." From the transcript, it does not appear that the District Court made any findings regarding the allegations that Adan abused Avans and raped her in front of Arianna, and the Court did not mention the allegations that Adan took frequent baths with the child and screamed in her ear, or regarding the photograph of Arianna wearing her underwear over her face. The District Court also found that the March 2002 gun incident would have been a "substantial factor" in proving a grave risk of harm to Arianna, but discounted its importance because it happened about 23 months before Avans removed Arianna from Argentina.

Based on this analysis, the District Court concluded that Avans' allegations did not constitute "a showing of a grave risk" to Arianna if she was returned to Argentina. The Court further concluded that, even if there was a grave risk of harm to Arianna, he would still be inclined to exercise his discretion to order Arianna returned, as "this matter is best determined by Argentinian courts because it is all interwoven with a struggle, as I said, for custody and determination of domestic abuse, which is not the purpose of the Convention."

## C. **Post-Hearing Issues**

On June 14, 2005 Avans filed a notice of appeal. The next day, the District Court ordered her to comply with its order on the merits by purchasing an airline ticket to Argentina for Arianna no later than June 17, 2005. On June 16, 2005 we granted an emergency stay of this order pending review and disposal of Avans' appeal. In light of the stay, Arianna remains in the United States.

On July 22, 2005 Avans moved the District Court to supplement the record on appeal with recently uncovered evidence pursuant to Federal Rule of Appellate Procedure 10(e)(2). This evidence included: (1) documents establishing that Avans succeeded in obtaining a permanent restraining order against Adan in New Jersey on June 28, 2005 due to Adan's repeated violations of the temporary restraining order; (2) an e-mail from Adan to Avans dated January 27, 2004, in which he tells her "when I see you I think I will rape you totally;" and (3) a message dated March 5, 2004, in which Adan tells Avans "now that my mind is clear from drugs and from alcohol I can realize all the time I lost and all the damages I caused you, (and [Arianna])." The District Court denied this motion on August 9, 2005.[3] Avans also brings to our attention that the Argentine

---

[3] We note that the e-mails are not admissible on appeal. In denying Avans' motion, the District Court correctly noted that Rule 10(e)(2) allows amendment of the record on appeal

11

only to correct inadvertent omissions, not to introduce new evidence. See United States ex rel. Mulvaney v. Rush, 487 F.2d 684, 687 n.5 (3d Cir. 1973) ("The purpose of the rule is to permit correction or modification of the record transmitted to the Court of Appeals so that it adequately reflects what happened in the District Court."). Moreover, we will not consider new evidence on appeal absent extraordinary circumstances, such as those that render the case moot or alter the appropriateness of injunctive relief, a change in pertinent law, or facts of which a court may take judicial notice. See Goland v. Cent. Intelligence Agency, 607 F.2d 339, 370 n.7 (D.C. Cir. 1978) (per curiam). The e-mails do not fall within any of these categories and we therefore cannot consider them.

As for the subsequent developments in the New Jersey criminal proceedings against Adan, although such evidence may ordinarily be judicially noticed, see Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 150-51 (3d Cir. 1973), we decline to do so here. Avans has not challenged the District Court's refusal to consider this evidence, nor has she made a proper motion to our Court for such consideration. Indeed, besides the motion to the District Court (the denial of which she does not appeal), the only attempt Avans made to have this evidence considered on appeal is her response to our September 8, 2005 order directing the parties to submit separate letter memoranda regarding the status of any relevant legal proceedings in Argentina. Her reply characterized our order as "invit[ing] counsel to go beyond the record to also submit to the Court the present status of the domestic violence proceedings against the petitioner in the United States." Our order did not invite counsel to do so. In this context, we have no choice but to conclude that Avans has

12

criminal court dropped the extradition request against her in August 2005 on condition that she voluntarily appear in Argentina to respond to the kidnaping charges.

On appeal, Avans asserts that the District Court erred in finding that the Convention required Arianna's return to Argentina. For the reasons that follow, we vacate the District Court's June 7, 2005 order and remand the case for further proceedings consistent with this opinion.

## II.

The District Court had jurisdiction over this case under 28 U.S.C. § 1331, as it is a civil action arising under the laws or treaties of the United States, and 42 U.S.C. § 11603(a), which grants state and federal courts "concurrent original jurisdiction of actions arising under the Convention." Our jurisdiction rests upon 28 U.S.C. § 1291, since Avans filed a timely notice of appeal from a final decision of the District Court.

## III.

### A. **Standard of Review**

The Convention is codified in United States law by the

---

waived her opportunity to have us consider this evidence on appeal.

International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. The purpose of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, preamble, 19 I.L.M. at 1501; see Yang v. Tsui, 416 F.3d 199, 201 (3d Cir. 2005) (same). Under Article 3 of the Convention, removing a child from a country is wrongful when:

> [a] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> [b] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

> The rights of custody mentioned in sub-paragraph [a] above . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3, 19 I.L.M. at 1501. A wrongful removal may nonetheless be justified if one of the following exceptions applies:

> [a] the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

> [b] there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13, 19 I.L.M. at 1502.

Under these provisions, an applicant seeking return of a child must demonstrate by a preponderance of the evidence that he or she had and was exercising custody rights over the child under the country of origin's laws and that the country of origin was the child's habitual residence. 42 U.S.C. § 11603(e)(1) (2000); Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995). Upon such a showing, the burden shifts to the party that wrongfully removed the child to show by clear and convincing evidence that the Article 13(b) exception applies, 42 U.S.C. § 11603(e)(2)(A) (2000); Feder, 63 F.3d at 222, or by a preponderance of the evidence that the Article 13(a) exception applies. 42 U.S.C. § 11603(e)(2)(B). Only Article 13(b) is at issue here.

Each of the applicant's initial burdens — custody and habitual residence — requires the "application of a legal standard . . . to historical and narrative facts," and thus an appeals court applies a "mixed standard of review, accepting the district court's historical or narrative facts unless they are clearly erroneous, but exercising plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." Id. at 222 n.9, 225; see Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir. 2005) (same). We have not explicitly articulated a standard of review for the opposing party's burden of proving by clear and convincing evidence that an exception applies, but we agree with other circuit courts that,

16

for all issues arising under the Convention, a District Court's determination of facts is reviewed for clear error and its application of those facts to the law, as well as its interpretation of the Convention, are reviewed <u>de novo</u>. <u>See</u> <u>Blondin v. Dubois</u>, 238 F.3d 153, 158 (2d Cir. 2001) ("<u>Blondin II</u>"); <u>Shalit v. Coppe</u>, 182 F.3d 1124, 1127 (9th Cir. 1999); <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1064 (6th Cir. 1996) ("<u>Friedrich II</u>").

## B. <u>Wrongful Removal</u>

As a starting point, we consider the threshold question of whether the removal of Arianna from Argentina was "wrongful" under Article 3 of the Convention. <u>See</u> Hague Int'l Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,506 (Mar. 26, 1986) (hereinafter "Hague Convention Analysis") ("The obligation to return an abducted child to the person entitled to custody arises only if the removal or the retention is wrongful within the meaning of the Convention."). We must therefore determine whether the District Court erred in finding that Adan had custody rights over Arianna at the time she was removed, that Adan was exercising those rights, and that Arianna was a habitual resident of Argentina.[4] As noted

---

[4] At oral argument, counsel for Adan asserted that Avans waived any challenge to the District Court's custody determination because Avans did not raise the issue in her brief to this Court. <u>See</u> <u>Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.</u>, 26 F.3d 375, 398 (3d Cir. 1998) ("An issue is waived unless a party raises it in its opening brief . . .

above, Adan must prove these by a preponderance of the evidence.  See Feder 63 F.3d at 222.

## 1. Rights of Custody and Access

The Convention defines custody rights as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a), 19 I.L.M. at 1501.  In determining custody, "the Convention calls into play a State's choice of law rules as well as its internal custody rights laws." Feder, 63 F.3d at 225.  This requires a careful examination of the country of origin's custody

.").  While we agree with Adan that Avans' brief is not a model of clarity (unfortunately, Adan's brief is even worse), Avans has challenged the District Court's finding that Adan had and was exercising custody rights in Argentina at the time Arianna was removed.  Avans states in her brief that the District Court's custody determination is "contested" because, she argues, the agreement between the parties gave her "full custody" in Argentina and, moreover, Adan was not exercising any alleged custody rights inasmuch as he was not providing child support and was only "sporadically visiting with the child." Avans' Br. at 19.  Although we have held that a "passing reference to an issue" is not sufficient to raise the issue on appeal, id. (citation and internal quotation marks omitted), Avans "presented substantive argument in support of [her] claim," Voci v. Gonzales, 409 F.3d 607, 609 n.1 (3d Cir. 2005), and we therefore deem the issue properly presented for review.

18

laws to determine whether the party seeking the child's return had custody rights in that country and was exercising them, within the meaning of that country's law, at the time the child was removed. Id. Once it is determined that a party had valid custody rights under the country of origin's laws, "[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." Hague Convention Analysis, 51 Fed. Reg. at 10,507.

The duty of the host forum — in this case, the District Court — to make a threshold determination of custody rights under the country of origin's laws is not novel; indeed, it comports with the federal courts' frequent responsibility to examine the law and choice of law rules of another forum to determine the rights and duties of litigants. Such a determination does not, of course, bind the other forum to reach the same result in future litigation, nor does it run afoul of comity concerns. Article 3's requirement that the host country determine custody rights under the country of origin's law to ascertain whether removal was "wrongful," and therefore whether the Convention applies, is a straightforward question of law of the sort federal courts routinely encounter, and thus presents no unusual burden on the competence of our courts.

That said, the Convention does not allow the state to

19

which a child has been wrongfully taken actually to <u>decide</u> who should have custody, <u>see</u> Hague Convention, art. 16, 19 I.L.M. at 1503, and thus a determination by the host country that a party had custody rights in the country of origin for purposes of determining whether removal was wrongful under the Convention has no bearing on the merits of a subsequent custody determination in the country of origin once the child is returned. <u>Id</u>. art. 19, 19 I.L.M. at 1503; <u>see</u> <u>Feder</u>, 63 F.3d at 221 n.5 (same); Hague Convention Analysis, 51 Fed. Reg. at 10,511 ("[A] decision under the Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue. It follows that once the factual status quo ante has been restored, litigation concerning custody or visitation issues could proceed . . . in the child's State of habitual residence."). The host country must therefore determine, as a threshold matter, whether the party seeking the child's return had valid custody rights under the country of origin's laws, and exercised those rights, to assure that the Convention is applicable. But, as indicated, this determination does not actually decide the custody question, and therefore does not resolve any subsequent custody adjudication in the country of habitual residence.

The Convention also contrasts "rights of custody," which may be vindicated by an order that the child be returned to the country of habitual residence, with "rights of access," which may not. Hague Convention, art. 5, 19 I.L.M. at 1501; <u>see</u> <u>Whallon v. Lynn</u>, 230 F.3d 450, 455 n.3 (1st Cir. 2000).

20

"[R]ights of access" are those rights "to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5(b), 19 I.L.M. at 1501; see 42 U.S.C. § 11602(7) ("[T]he term 'rights of access' means visitation rights."). The Convention affords limited remedies for a parent who removes a child from a country in contravention of another's parent's rights of access, such as "direct[ing] the person who . . . prevented the exercise of rights of access . . . to pay necessary expenses incurred by or on behalf of the applicant . . . ." Hague Convention, art. 26, 19 I.L.M. at 1504. "[S]uch remedies <u>do not</u> include an order of return to the place of habitual residence," however. <u>Whallon</u>, 230 F.3d at 455 n.3 (emphasis added).

## 2. Habitual Residence

The determination of habitual residence "is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." <u>Whiting v. Krassner</u>, 391 F.3d 540, 546 (3d Cir. 2004). When a child is too young to have an intent regarding her habitual residence, the touchstone inquiry is "shared parental intent." <u>Id</u>. at 548. As we explained in <u>Feder</u>,

> "[a]ll that the law requires is that
> there is a settled purpose. That is
> not to say that the [person] intends
> to stay where he is indefinitely.

21

Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled."

63 F.3d at 223 (quoting In re Bates, No. CA 122-89, slip op. at 10 (High Ct., Fam. Div.) (Eng. 1989)).

### 3. Analysis

Turning first to the question of habitual residence, Adan no doubt proved by a preponderance of the evidence that Argentina is Arianna's country of habitual residence. Though she was born in the United States, Arianna moved to Argentina with her mother and father when she was three months old. With the exception of two brief visits to relatives in the United States in May 2001 and May 2003, Arianna lived in Argentina with her parents until her mother removed her to the United States in February 2004. Her parents are both from Argentina and her father is an Argentine citizen. Her parents were

22

employed in Argentina, had homes in Argentina, and Arianna was in school in Argentina. Under these circumstances, Adan and Avans clearly had a "settled purpose" and "shared parental intent" to raise their daughter in Argentina, and that country is therefore her habitual residence.

The question of custody is more difficult. The record does not reveal any court-approved agreement or adjudication of custody in Argentina; rather, it appears the parties had an informal agreement between themselves, but the record is unclear on the terms of this agreement — aside from noting that it gave Avans "custody" and established a schedule for Adan to visit Arianna — and the parties have not provided us with the agreement in English. Moreover, there is no evidence whether the agreement was properly memorialized under Argentine law, or whether the parties' chaotic relationship caused the agreement to be reconsidered or repudiated. Indeed, Adan conceded in his testimony before the District Court that he did not consider the agreement binding because it "was not ratified in front of a judge," and that the agreement "didn't last long really." The parties have not cited, and the District Court did not mention, any provisions of Argentine law related to the creation, terms, or enforceability of such agreements, and we therefore have insufficient information to conclude whether the agreement had "legal effect under the law of [Argentina]," as required by Article 3 of the Convention.

We also note that, if the agreement is enforceable under Argentine law, it appears to vest custody rights in Avans and to afford Adan merely a right of access via visitation, which Adan may not vindicate through an order that Arianna be returned to Argentina. See Whallon, 230 F.3d at 455 n.3. We do not conclusively determine this because, as we have said, we do not know the precise terms of the agreement, if it was in effect at the time Arianna was removed, or if Argentine law provides a different allocation of rights. We merely note that there is a significant question in this case as to what type of rights Adan has.

As for other provisions of Argentine law, although the parties made passing — and, indeed, contradictory — references to a section of the Argentine code during the District Court hearing, they have not provided us with any citations to Argentine legal authorities and the District Court did not examine, rely on, or even mention Argentine law in determining whether Adan had lawful custody rights over Arianna at the time of her removal. Moreover, we have been unable to locate relevant provisions of the Argentine code in English. The little information we have obtained on Argentine family law is not helpful because it is in some respects contradictory and, more importantly, the factual record does not reveal the terms or status of the parties' custody arrangement.[5]

---

[5] For example, it appears that in cases of divorce in Argentina "[c]hildren under five years of age are given to the

Moreover, we note that the mere fact Adan filed a criminal complaint against Avans in Argentina for kidnaping the child is insufficient, without more, to establish that Adan had

---

custody of the wife," <u>Martindale-Hubbell Int'l L. Digest</u> ARG-11 (2004). It is thus possible that, although the parties were never married, an Argentine court would find that Avans had sole custody of Arianna at the time of removal — depending, of course, on the terms and enforceability of the parties' custody agreement. Conversely, it appears that "[w]hen a parent wishes to relocate with the child in a foreign country, he will need to acquire the court's authorization when a legal custody arrangement has been settled, [as well as] when a parent has only physical custody of the minor, since according to article 264 of the Argentine Civil Code, consent of both parents is required in order to leave the country." Directorate of Legal Research, Law Library of Congress, <u>Report for Congress – Hague Convention on International Child Abduction</u> 18 (2004).

Therefore, Avans apparently would have needed court permission to take Arianna out of Argentina, although it is unclear whether this requirement confers any "custody rights" on Adan for purposes of Article 3. It is also highly probable that there is an express provision in Argentine law that sets out the default custody rights that unmarried parents share, and it is also possible that the terms of the parties' agreement (whatever they may be) are enforceable under Argentine law and therefore dispositive. All of these outstanding questions highlight the fact that, based on the record before us, we cannot determine what rights — custody, access, or otherwise — Adan enjoyed in Argentina.

25

custody rights. He has not provided any evidence, for example, that custody rights are a necessary element of standing to bring such a complaint, or that the Argentine authorities' acceptance of such a complaint necessarily establishes that he had such rights.

The District Court, for its part, merely found that Adan "furnished and maintained contact with the child during her stay in Argentina" because he paid for some of the child's expenses and saw the child on a fairly regular basis. The Court therefore concluded it was appropriate to move directly to the question of "whether or not [Avans] has proved clearly and convincingly that the exceptions to . . . being required to return the child to Argentina[] obtain." There is not, however, any indication from the record or from any of the available legal sources on Argentine family law that "furnish[ing] and maintain[ing] contact" with a child is sufficient to create valid custody rights in Argentina. We therefore conclude that the District Court erred in finding that Adan satisfied his burden of proof as to his custody rights under Argentine law.

In light of the District Court's failure to consider this issue, we are compelled to vacate its June 7, 2005 order and remand the case for further factfinding to determine: (1) what is the custody law of Argentina; (2) what are the terms of the parties' agreement regarding custody of Arianna; (3) whether that agreement is enforceable under Argentine law; and (4) under the agreement (or, if the agreement is not enforceable,

Argentine family law), whether Adan had custody rights or mere rights of access, and whether he was validly exercising those rights at the time Arianna was removed. Upon the development of a proper factual record, we shall be in a better position to review the District Court's factual and legal conclusions. We further note that, pursuant to Article 15 of the Convention, the District Court may request that the parties obtain from the Argentine courts a determination of whether the removal of Arianna from that country was wrongful under the Convention, which would necessarily include an adjudication of Adan's custody rights under Argentine law at the time she was removed. See Hague Convention, art. 15, 19 I.L.M. at 1503. Although such a request is within the District Court's discretion, we are of the opinion that a determination of Adan's custody rights at the time of removal by an Argentine court (provided, of course, that the Argentine courts have authority under Argentine law to make such a determination at this stage) would be very helpful in properly determining the wrongfulness of Arianna's removal.

## C.  **The Article 13(b) Exception**

If Adan does not prove by a preponderance of the evidence that he had valid custody rights over Arianna in Argentina, that would be the end of the matter; the Convention would not apply and Adan would have no basis on which to seek Arianna's return. If, however, Adan satisfies his burden and establishes that he had custody rights in Argentina, the burden would shift to Avans to prove by clear and convincing

27

evidence that the Article 13(b) exception applies.  See Feder, 63 F.3d at 222.  Because we conclude that the District Court erred in its analysis of the alleged grave risk of harm to Arianna, we request that it address those deficiencies on remand if it concludes that Adan has satisfied his burden of establishing custody rights.

## 1.  Grave Risk of Harm

The Convention's Article 13(b) exception is  "narrowly drawn."  See Feder, 63 F.3d at 226.  "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement — namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" Blondin v. Dubois, 189 F.3d 240, 246 (2d Cir. 1999) ("Blondin I") (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993) ("Friedrich I")); see Baxter, 423 F.3d at 367 ("[T]he Convention's procedures are designed to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.").    As the U.S. State Department has explained, an

> "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or

28

other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

Hague Convention Analysis, 51 Fed. Reg. at 10,510; Baxter, 423 F.3d at 373 (same); see Blondin II, 238 F.3d at 162 (noting that a "grave risk of harm" encompasses "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," but not "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences").

There is little question that, under this standard, the abuse, sexual and otherwise, that Avans contends Adan has

inflicted on Arianna would, if true, qualify as an intolerable situation and grave harm for purposes of Article 13. The question, however, becomes whether Avans produced clear and convincing evidence of these allegations, and whether she established, as she must, that "'the court[s] in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'" Blondin II, 238 F.3d at 162 (quoting Friedrich II, 78 F.3d at 1069) (emphasis omitted).

We also note that, in considering the Article 13(b) exception, a court must "take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." Blondin I, 189 F.3d at 248. Therefore, even if the court finds that authorities in the country of habitual residence are capable of safeguarding the child, it must still carefully tailor its order to counter whatever risk of harm exists — including returning the child in the custody of the parent who removed the child — "thus reducing or eliminating the risk of harm that might otherwise be associated with granting [the] petition." Id. at 249.

## 2. Analysis

Although the District Court found Avans more credible than Adan and stated that Adan's demeanor was "quite

30

consistent with the manner in which he is portrayed by the respondent [and is] not inconsistent with what she claims he did," the District Court nonetheless found that Avans did not sustain her burden of proof because: (1) her allegations of Adan's actions toward Arianna, even if true, were not evidence of child abuse; (2) she did not provide corroboration of the child abuse, such as medical examinations or police reports from Argentina; and (3) her testimony that Adan had effectively rigged the Argentine judiciary and police against her through bribery was not substantiated. Although we express no opinion on whether the quantum of Avans' evidence proves a grave risk of harm, we do believe the Court abused its discretion in the manner in which it considered her evidence and tailored its order. We therefore direct it to remedy these errors on remand if it concludes Adan has sustained his burden of proving he had and was exercising valid custody rights under Argentine law at the time Arianna was removed.

As noted, the District Court Judge made no written findings of fact, and therefore we must extract findings from his oral decision at the hearing. The transcript reveals that the Court did not reject Avans' testimony that she had been repeatedly abused, raped, and threatened with a gun,[6] and the

_____

[6] We note that the evidence of Adan's abuse of Avans is relevant to the District Court's determination of whether returning Arianna to Argentina would expose the child to a grave risk of harm. See, e.g., Walsh v. Walsh, 221 F.3d 204,

Court did not mention Avans' testimony that Arianna would return from even brief visits with her father with wet hair and would tell her mother that Adan bathed with her, Avans' further testimony and accompanying police report that Adan screamed in the child's ear to force Avans to agree to return to Argentina, or the photograph Adan took of Arianna with her underwear covering her face. The Court did reject portions of Avans' testimony that Adan had abused Arianna, not because it found that the incidents she described did not occur but because: (1) Arianna's statement that her father was "putting something hot in her butt" "c[ould] be anything"; (2) Avans' discovery of a pubic hair in Arianna's vagina "means nothing" because in the absence of medical evidence it could have resulted from "the child . . . lying on a dirty bed"; and (3) Arianna's statement that her father "love[d] [her] with his tongue" was "not significant" because parents sometimes lick their children and "sometimes the tongue may have gone too far."

In our view, the District Court's analysis of Avans' testimony is both incomplete (in that it does not take into account large portions of her testimony that suggest a grave risk

220 (1st Cir. 2000) (holding that such evidence is relevant when considering whether a grave risk of harm to a child exists because "credible social science literature establishes that serial spousal abusers are also likely to be child abusers" and "both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser").

of harm to Arianna if she is returned to Argentina) and reflects an overly compartmentalized view of child abuse. Even assuming there is an innocent explanation for each allegation of abuse in isolation, taken together they are far less easily explained. Perhaps it is true that a child's report that her father put his tongue in her mouth is potentially innocent, but when coupled with reports that he also "put[] something hot in her butt," took baths with her on several occasions, raped her mother in front of her, took a photograph of her with her underwear covering her face and mailed it to her mother, and that a pubic hair was discovered in the child's vagina, such an incident is far less susceptible to innocent explanation. Just as a finder of fact in state court must analyze the "totality of the circumstances" in determining the credibility of child abuse allegations in a criminal case, see, e.g., State v. P.H., 840 A.2d 808, 819-20 (N.J. 2004), so too is it appropriate that a District Court consider the totality of the circumstances in determining whether alleged abuse occurred in a case brought under the Convention. The District Court's treatment of the child abuse allegations in this case leads us to conclude that it did not consider the totality of the circumstances as we understand that phrase.[7]

---

[7] The Supreme Court has noted, albeit in a different context, that reviewing the totality of circumstances "precludes [a] divide-and-conquer analysis" under which a court "evaluat[es] and reject[s] . . . factors in isolation from each other." United States v. Arvizu, 534 U.S. 266, 274 (2002) (reviewing the totality of the circumstances to determine

33

We note a similar problem with the District Court's consideration of Avans' contention that the Argentine courts and authorities were unable or unwilling to protect her. The Court concluded that Avans did not produce sufficient evidence that "Argentinian courts are without the skill, the expertise, or the concern to deal with the matter involving these parties." Avans testified about her numerous experiences with Argentine law enforcement when police officers refused to offer her any assistance, and the fact that Adan violated a temporary restraining order issued by an Argentine court after the police refused to enforce it. Adan did not contest these allegations in his testimony, and the District Court did not discount Avans' testimony; rather, the Court found Avans' allegations related to Adan's alleged bribery of judges and police officers to be unsubstantiated. It therefore failed to consider and reject the majority of Avans' proof related to the inaction of Argentine courts and police. Although she bore the burden of setting forth clear and convincing evidence to substantiate her claims under Article 13, the District Court bore the responsibility to evaluate adequately her evidence and explain in a reasoned way why that evidence was unavailing. Its analysis in this case falls short of that standard.

---

whether Border Patrol officers had reasonable suspicion to initiate an investigatory stop of defendant's vehicle). Indeed, the Court noted that "[a]lthough each of the series of acts was 'perhaps innocent in itself,' we [have] held that, taken together, they 'warranted further investigation.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).

If, upon proper consideration of these matters, the District Court concludes that Avans has not satisfied her burden of proving a grave risk of harm to Arianna or that the Argentine authorities will not protect her, it should enter an appropriate order requiring Arianna's return to Argentina. This requires careful tailoring to ameliorate any risk of harm to Arianna that may result from granting the petition and a consideration of alternative arrangements that will safeguard her well-being pending effective action by Argentine authorities. The District Court's June 7, 2005 order was not satisfactory in this regard. It simply stated that "Respondent shall return the child to Argentina immediately," but did not state in whose custody she should be returned, or what actions should be taken to assure that she is safe. Indeed, based on the District Court's order, we have no way of knowing what would have happened to Arianna upon her return to Argentina, which is especially troubling given the distressing allegations at issue, many of which the District Court Judge accepted or, at least, did not reject. Although the Convention seeks to facilitate the prompt return of wrongfully removed children to their country of habitual residence, it does not condone deciding that a child is another country's problem and dumping her there, and nor do we.

Given the state of the factual record, we instruct the District Court on remand to: (1) make detailed, written findings of fact on all allegations of abuse and harm visited upon Avans and Arianna by Adan, and on the protective efficacy of the Argentine courts and police, evaluating the witnesses' complete

35

testimony and all other evidence in the record;[8] (2) consider the totality of circumstances related to the alleged child abuse, rather than simply considering and explaining away each allegation in isolation; and (3) if the Court decides that Avans has not satisfied her burden of proving a grave risk of harm and the inability of Argentine authorities to protect the child, carefully tailor an order designed to ameliorate, as much as possible, any risk to Arianna's well-being.[9]  We reiterate that

---

[8] We do not, of course, hold that it is reversible error for a district court to make oral findings of fact rather than written ones.  But in this particular case, we believe the complicated factual history calls for a formal, written analysis of the full field of evidence to allow us to discharge properly our review function.

[9] In his oral decision, the District Judge indicated that, even if we conclude that he erred in finding no grave risk of harm to Arianna in Argentina, he would still be inclined to exercise his discretion to return Arianna to Argentina because, in his view, the matter "is best determined by Argentinian courts."  The District Court is correct that, even if Avans succeeds in establishing a grave risk of harm, it still retains discretion to order Arianna returned to Argentina. See Feder, 63 F.3d at 226; Hague Convention Analysis, 51 Fed. Reg. at 10,509.  We have no occasion on this appeal to consider whether, on the facts of this case, such a decision would be an abuse of discretion.  That determination is, at this point, speculative — and, more importantly, it would require us to examine the terms of a new order that seeks to ameliorate any

such analysis is only necessary if the District Court determines that Adan has satisfied his burden of proving, by a preponderance of the evidence, that he had and was exercising valid custody rights over Arianna at the time she was removed.

## IV.

We are well aware that the Convention requires the "prompt return of children wrongfully removed" and that we must act "expeditiously" in doing so. Hague Convention, arts. 1(a), 11, 19 I.L.M. at 1501-02. The desire for a swift resolution to this matter cannot, however, outweigh our duty to see that the law is properly applied. For the reasons noted, we vacate the District Court's June 7, 2005 order and remand the case to that Court with instructions to conduct further factfinding to determine: (1) what is the custody law of Argentina; (2) what are the terms of the parties' agreement regarding custody of Arianna; (3) whether that agreement is enforceable under Argentine law; and (4) under the agreement (or, if the agreement is not enforceable, Argentine family law), whether Adan had custody rights or mere rights of access, and whether he was validly exercising those rights at the time Arianna was removed.

---

risk to the child upon her return, which is a matter for the District Court to consider on remand. We therefore leave this question, and the general issue of when a district court may exercise such discretion notwithstanding a grave risk of harm to the child, for a future appeal when the issue is squarely presented.

If, as a result of this factfinding, the District Court concludes that Adan has satisfied his burden of proving that he had valid custody rights over Arianna under Argentine law at the time Arianna was removed, and was actually exercising those rights, the District Court must then: (1) make detailed, written findings of fact on all allegations of abuse and harm visited upon Avans and Arianna by Adan, and on the protective efficacy of the Argentine courts and police, evaluating the witnesses' complete testimony and all other evidence in the record; (2) consider the totality of circumstances related to the alleged child abuse, rather than simply considering and explaining away each allegation in isolation; and (3) if the Court decides that Avans has not satisfied her burden of proving a grave risk of harm and the inability of Argentine authorities to protect the child, carefully tailor an order designed to ameliorate, as much as possible, any risk to Arianna's well-being. Our stay of the District Court's June 15, 2005 order shall remain in place until further order.