

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-2007

# Yang v. Tsui

Precedential or Non-Precedential: Precedential

Docket No. 06-3962

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Yang v. Tsui" (2007). 2007 Decisions. Paper 493.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/493

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3962

———

TSAI-YI YANG
v.
FU-CHIANG TSUI,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 03-cv-01613)
District Judge:  Honorable Thomas M. Hardiman

———

Submitted Under Third Circuit LAR 34.1(a)
May 16, 2007

Before:  FISHER, NYGAARD and ROTH, *Circuit Judges*.

(Filed: August 22, 2007)

Andrew D. Glasgow
AAI Law Firm
239 Fourth Avenue
Investment Building, Suite 1207

Pittsburgh, PA 15222
    *Attorney for Appellant*

Walter A. Angelini
Angelini & Angelini
3067 Pennsylvania Avenue
Weirton, WV 26062
    *Attorney for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Fu-Chiang Tsui ("Tsui") appeals the District Court's grant of the Child Return Petition ("Petition") filed by Tsai-Yi Yang ("Yang") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501.[1] Tsui claims that the District Court erred in its determinations that Tsui wrongfully retained Raeann Tsui ("Raeann" or "the child") and that Raeann should be returned to Canada despite the "wishes of the child" exception. We disagree, and for the reasons that follow, will affirm the District Court's judgment.

———

[1]The implementing statute is the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. 11601, *et. seq.*

2

I.

Although Yang and Tsui have known each other since they were children in Taiwan, our focus is on the events that occurred after they both moved to Pittsburgh. Tsui attended the University of Pittsburgh and earned a Ph.D. in Electrical Engineering in 1997. Yang arrived in Pittsburgh in 1994, a few years after Tsui. She also attended the University of Pittsburgh where she earned a Master's of Science in Information Science in 1995.

Tsui was married and had a child around the time of Yang's arrival in Pittsburgh. However, a romance ensued between him and Yang in 1995, and Yang became pregnant. Tsui and his mother invited Yang to move in with their family, which included Tsui's wife and child. Yang accepted the offer and moved in with the family sometime before she gave birth in 1996.[2]

Yang gave birth to Raeann on June 11, 1996, in Pittsburgh.[3] Yang and Raeann lived with Tsui and his family until December 1996. At that time, Tsui, Yang and Raeann went to Taiwan. Tsui only stayed for two weeks, but Yang and Raeann remained for five or six months. Yang and Raeann then returned to Pittsburgh where they lived with Tsui and his

---

[2]The parties disagree on what month Yang moved in, but the disagreement does not impact our analysis in this case.

[3]Raeann is a United States citizen.

3

mother.[4]  In August 1997, Yang and Raeann traveled to Taiwan for a funeral and because Yang's visa was about to expire. Although Yang did not initially intend to move to Taiwan at that time, she and Raeann remained there for four years.

Yang wanted to maintain the relationship with Tsui by telephone and although they spoke once a month, he did not want to continue the relationship. Raeann was too young to communicate with Tsui by telephone. Tsui also traveled to Taiwan on several occasions. However, despite knowing where Yang and Raeann resided, he did not visit them. Yang claims that he also provided no financial support for Raeann during this time period. However, Tsui claims to have given Yang approximately $6,000 while she and Raeann were in Taiwan.

In 2000, Yang decided to immigrate to Canada with Raeann. Yang was unable to return to the United States and she believed that the clean air in Canada would help a skin condition that Raeann had developed. Tsui claims, however, that Yang actually was trying to move closer to him.

In July 2000, Yang went to Canada for several days in order to activate her visa, but then returned to Taiwan to prepare for the move. Yang and Raeann moved to Surrey, British Columbia. Yang was unable to find a job in her field, but she obtained a part-time position at McDonald's. Although Yang provided primary care for Raeann, she had some assistance from

---

[4]Tsui's wife had returned to Taiwan after a disagreement with Tsui.

4

friends and neighbors. She enrolled Raeann in kindergarten in September 2001.

Additionally, at Yang's request, Tsui started providing financial support for Raeann. He gave Yang approximately $6,000, a computer, and other gifts. Yang and Tsui maintained contact by telephone and email on at least a monthly basis. Although Tsui and Raeann's contact remained limited, he gave Yang a digital camera to enable her to send him pictures of Raeann.

Yang became ill in August 2001, and was diagnosed with malignant thymoma in September 2002. The tumor was in her chest and caused Yang to suffer from myasthenia gravis, a condition which resulted in muscle weakness in her chest and neck. Additionally, the tumor caused her difficulty in speaking and swallowing. Yang's doctor explained that the tumor had to be removed, which would require major surgery. The doctor anticipated that she would be hospitalized for seven to ten days, and that Yang would be unable to work during the two to three month recovery period.

Yang turned to Tsui for help with Raeann during the surgery and recovery period. In an email dated October 9, 2002, Yang told Tsui: "[i]t would be better if you can pick up and take care of Raeann. I can't work for at least two and a half months . . . if anything happens to me, at least you can still raise Raeann." Although at first resistant to have Raeann move in

5

with his family,[5] Tsui finally agreed to come to Surrey and bring Raeann with him to Pittsburgh. As Tsui was picking Raeann up in mid-October, he recommended having her remain in Pittsburgh until the end of the school term. Yang agreed, but when doing so she did not know that the school term in Pittsburgh did not end until late January.

The same day that Yang entered the hospital, October 23, 2002, she sent Tsui an email. The email explained the she packed up Raeann's belongings in three bags. The bags included winter clothes, summer clothes, shoes, and toys. She also stated that some of the items may be unnecessary. The email contained the following postscript: "Raeann doesn't like long sleeves." Tsui arrived in Canada on October 26, 2002, and Yang's friend who had been watching Raeann met him at the airport. The friend took Tsui and Raeann to see Yang at the hospital where she was recovering from her surgery which took place on October 24, 2002.[6] Yang gave Tsui documentation to enable him to register Raeann in school and to travel with him to the United States. Tsui maintains that there was no agreement that Raeann would stay with him for a set period of time. He claims that there was no limit on how long Raeann would remain in Pittsburgh, but rather the agreement was that Raeann would remain in Pittsburgh until Yang fully recovered. It is undisputed that the parties agreed that Raeann would reside

---

[5]At this point, Tsui had reconciled with his wife, and they resided in Pittsburgh with their two sons.

[6]Raeann had not seen her father since August 1997.

6

permanently with Tsui if Yang died.[7]  Tsui and Raeann traveled to Pittsburgh on October 27, 2002, and Tsui gave Yang $1,000 before he left.

After Yang was discharged from the hospital on November 2, 2002, she spoke to Raeann daily by telephone. However, Tsui's wife felt that daily telephone calls were burdensome to their family and thus Tsui limited the calls to every other night.  According to Yang, Raeann was homesick and wanted to return to Canada.  Yang told Tsui to bring Raeann back to Canada and even offered to come to Pittsburgh to get her.  She threatened legal action if he refused.  Tsui claims, however, that Yang did not request that he return Raeann until April 2003, when he received a letter from Yang's attorney, Andrew Sandilands ("Sandilands").

On November 20, 2002, Yang intended to travel to Pittsburgh to bring Raeann back.  She was unable to make the trip, however, because she had difficulty breathing and went to the emergency room.  Apparently, Yang's medical problems remained and she was admitted to the Intensive Care Unit ("ICU") on November 22, 2002.  She was in the ICU for one week, and remained in the hospital until December 28, 2002. Although Yang was unable to speak, others contacted Tsui on her behalf.  A social worker at the hospital spoke to Tsui who

---

[7]Tsui admits that Yang expected to recover fully within two or three months.  However, he claims, based in part on his knowledge of the condition because of his work in the medical field, that he knew Yang's condition was serious and that the recovery would be longer than Yang expected.

7

indicated that he would bring Raeann to Canada if Yang's condition worsened. Tsui also told Yang's brother and her friend that he would bring Raeann back in December.

On December 2, 2002, Yang was able to speak, although with great difficulty. On that day, she spoke with Tsui as she was worried that he did not intend to return Raeann. Tsui assured Yang that he would return Raeann at the end of January when the school term ended. Tsui then took Raeann on vacation without informing Yang that they were going away, and she was concerned when she could not reach them for several days. However, Tsui did send Yang pictures of Raeann in the middle of December.

On December 17, 2002, the day before the pictures arrived, a package addressed to Yang arrived at her friend's house. The package contained a "Complaint for Custody," filed in Pennsylvania state court on December 11, 2002. It also included an "Order for Generations Education/Mediation Seminar," which is a service offered by the Court of Common Pleas of Allegheny County for parents involved in custody disputes. According to the Order, Yang was to attend a mandatory seminar in Pittsburgh on January 4, 2003, and a mediation session on February 11, 2003.

Yang was unable to attend the seminar due to her health. After her release from the hospital, she underwent twenty sessions of radiation therapy. Although she contacted the "Generations" office to explain that she would be unable to attend the seminar, neither she nor her attorneys contacted the Pennsylvania courts or appeared at the seminar or mediation.

8

According to Yang, after she spoke with the "Generations" office, she believed that the proceedings were adjourned. However, the proceedings were not adjourned and Tsui received a court order on February 6, 2003, which granted him custody of Raeann. The order included a proposed visitation schedule, but Yang never agreed to the schedule.

Yang hired Sandilands upon receipt of the Complaint for Custody. On January 6, 2003, Sandilands sent a letter to Tsui demanding Raeann's immediate return. He also initiated custody proceedings in Canada. The Canadian proceedings consisted of five hearings and continued from January to March 11, 2003. Yang attended every hearing, except for the first one. Tsui appeared only through counsel, who represented him at all of the hearings except for the first one. On March 25, 2003, the Supreme Court of British Columbia granted interim custody of Raeann to Yang. Based on the decision, Sandilands again sent a letter requesting that Tsui return Raeann. Tsui claimed that this was the first formal request that he received to return Raeann to Canada.

In May 2003, as Raeann was still residing with Tsui, Sandilands filed an application with the Canadian Attorney General's Office seeking to have Raeann returned under the Hague Convention. Yang filed a petition under the Hague Convention in the United States District Court for the Western District of Pennsylvania on October 23, 2003. The District Court initially abstained from exercising jurisdiction. The decision was appealed and oral argument was held before this Court in Philadelphia in September 2004. On appeal, this Court reversed the District Court's judgment and remanded the case

for further proceedings. *Yang v. Tsui*, 416 F.3d 199, 205 (3d Cir. 2005) ("*Yang I*"). Yang traveled to the United States for the oral argument, and this was the first time she had seen Raeann since October 2002.[8]

Yang returned to Pittsburgh in November 2005 and sought a visitation schedule. As the parties could not reach an agreement, Yang filed a motion requesting that the District Court help establish a schedule. Yang was granted visitation with Raeann three times a week for several hours. The visits occurred at the District Court's chambers during the week and at an alternative location on the weekend.

The District Court held a hearing on the merits at which the parties and other witnesses testified. It also conducted an *in camera* examination of Raeann. During the examination, Raeann testified that she wanted to remain in Pittsburgh. The

[8]While in the United States, Yang also attempted to see Raeann at Tsui's home and Raeann's school. She even went to the homes of some of Tsui's neighbors in order to try to see Raeann and to leave her gifts. At trial, Tsui claimed that Yang left threatening message's on the answering machine at his home, and even followed his wife's car. Tsui sought and obtained a Protection From Abuse Order ("PFA") from the Court of Common Pleas of Allegheny County. The PFA, issued on October 8, 2004, prohibited Yang from seeing or speaking with Raeann without Tsui's permission. Yang was served with the PFA when she returned to Canada. Under the PFA, Yang's contact with Raeann was very limited, and she was eventually allowed to talk to Raeann twice a week for a half-hour.

District Court issued a written Opinion and Order on August 25, 2006, in which it granted Yang's Petition.

In its Opinion, the District Court began its analysis by determining that November 20, 2002, was the date of retention in this case. This factual determination was based on the parties' testimony and Tsui's admission that Yang demanded, in mid-November, that Tsui return the child. The District Court then turned to the issue of the child's habitual residence. Because Raeann was only five years old when she left Canada, the District Court found that she was too young to possess an intent regarding her habitual residence. Therefore, the District Court turned its focus to the parents and whether they both intended to make Pittsburgh Raeann's home immediately prior to November 20, 2002. The District Court held that the overwhelming evidence in this case demonstrated that the parties only intended for Raeann to stay with Tsui for two or three months until Yang recovered. Tsui and Yang only intended for Pittsburgh to become Raeann's home if Yang passed away because of her illness. Based on these facts, the District Court determined that Canada was Raeann's habitual residence on November 20, 2002.

The next factor for the District Court to consider was Yang's custody rights at the time of retention. As such a determination is based on the custody laws of the country in which the child resided at the time of removal, both parties called expert witnesses to testify about the custody law of British Columbia. The District Court held that under British Columbia law Yang had custody of Raeann on November 20, 2002, because Raeann usually resided with Yang. The District

11

Court also found that Yang was exercising her custody rights at the time of retention. Therefore, the District Court held that Yang had satisfied her burden under the Hague Convention of proving that the child was wrongfully retained.

Based on its determination, the Hague Convention required the District Court to order that Raeann be returned to Yang unless an exception applied. As the burden to prove that an exception applies was on Tsui, the District Court had to determine whether he had met his burden of proving the applicability of the "wishes of the child" exception.[9] It believed that any objection that Raeann had to returning to Canada was based on Tsui's wrongful retention. The District Court refused to apply the exception because its application in such a situation would frustrate the purpose of the Convention. The District Court also explained that even if this was an appropriate case for the exception, Tsui had not met his burden of proving that Raeann was of sufficient age and maturity for her views to be taken into account. Further, the Court found that Raeann's views has been formed by outside influence. Additionally, her reasons for staying, which included comfortable living conditions and friends, were not sufficient to satisfy the requirements for the exception. Therefore, the District Court concluded that even if the exception could apply to this case, the requirements for its application were not met.

---

[9]The District Court also determined that no other exception applied. As Tsui does not appeal that determination, it is unnecessary for us to address the other exceptions.

As Tsui did not prove that an exception applied, the District Court granted Yang's Petition and ordered that Tsui return Raeann to Yang by September 5, 2006. Tsui then filed this timely appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review the District Court's factual findings for clear error, but our review of its conclusions of law is plenary. *See Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004). We will not reverse the District Court's factual findings as long as its "account of the evidence is 'plausible in light of the record,' even if convinced that we 'would have weighed the evidence differently.'" *Karkkainen v. Kovalchuk*, 445 F.3d 280, 289 (3d Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

## III.

The two main goals of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." Hague Convention, art. 1.[10] It is well settled that the Convention was

[10]Both the United States and Canada are Contracting States.

13

not designed to resolve international custody disputes. *See*, *e.g.*, *Karkkainen*, 445 F.3d at 287. Rather, the Convention was designed "to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Id.*

A person claiming that a child has been wrongfully removed to or retained in the United States can commence judicial proceedings under the Convention by filing a petition for the return of a child in a state or federal court which has jurisdiction where the child is located. 42 U.S.C. § 11603(b). In order for the petition to be granted, the petitioner must prove by a preponderance of the evidence that the removal or retention was wrongful. Article 3 of the Convention defines the removal or retention of a child as wrongful when:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Further, "[a] petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless 'the child to whom the petition relates is "habitually resident" in a State signatory to the Convention

14

and has been removed to or retained in *a different state*.'" *Karkkainen*, 445 F.3d at 287 (quoting *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005)) (emphasis in *Karkkainen*).

We have laid out four questions that must be answered in a wrongful removal or retention case. *Id.* A court must determine (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Id.*

The determination by a court that a child was wrongfully removed or retained does not automatically mean that the child must be returned to his or her habitual residence. Rather, once the petitioner has proven his or her case, "the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Id.* at 288 (internal quotation marks and citation omitted).[11]  "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention, and even where a defense applies, the court has the discretion to order the child's return." *Id.* (internal citations omitted).

---

[11]In this case, as discussed below, Tsui argues the "wishes of the child" exception applies to this case. Hague Convention, art. 13. Therefore, Tsui's burden is to show by a preponderance of the evidence that this exception applies. *See* 42 U.S.C. § 11603(e)(2)(B).

15

On appeal, Tsui claims that the District Court erred in its determinations of the last three questions in the wrongful removal or retention analysis.[12]  Specifically, Tsui claims that the District Court incorrectly found Canada to be Raeann's habitual residence immediately before her retention, that Yang had custody rights, and that she was exercising them at the time of the retention.  Tsui also claims that the District Court should not have ordered Raeann's return to Canada as he met his burden for proving the "wishes of the child" exception, which would enable Raeann to remain in the United States even if she was wrongfully retained.

A.

We first need to determine whether the District Court was correct in its determination that Canada was Raeann's habitual residence immediately before the retention in this case.  If we hold that Canada was Raeann's habitual residence on the date of retention, we must then continue the analysis to determine whether the retention was wrongful.  *Karkkainen*, 445 F.3d at 291.  But, if we hold that the United States was Raeann's habitual residence at that time, the analysis is complete as the

---

[12]Tsui does not appeal the District Court's determination that November 20, 2002, was the date of wrongful retention.  This finding is supported by the record, as November 20, 2002, is the first time that Yang demanded that Tsui return Raeann, and we will not disturb it.  *See Karkkainen*, 445 F.3d at 290 (explaining that the date of wrongful retention begins when the child remains with the respondent against the petitioner's clearly communicated desire to have the child returned).

Hague Convention would not apply because her retention in the United States would not be wrongful as defined by Article 3. *See id.* Such a determination presents a mixed question of fact and law. *Id.*

As we have said on several occasions, such a determination is fact-intensive and "'necessarily varies with the circumstances of each case.'" *In re: Application of Ariel Adan*, 437 F.3d 381, 392 (3d Cir. 2006) (quoting *Whiting*, 391 F.3d at 546). A case such as this, where the petitioning parent had consented to let the child stay abroad for an undetermined period of time, is especially fact-intensive. *Mozes v. Mozes*, 239 F.3d 1067, 1077-78 (9th Cir. 2001).

We have defined habitual residence as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir. 2005) (internal quotation marks and citations omitted). The inquiry focuses on the child, but also must consider the "parents' present, shared intentions regarding their child's presence [in a particular location]." *Id.* (internal quotation marks and citations omitted); *Karkkainen*, 445 F.3d at 297 (explaining that courts must consider the parents' present shared intentions).

On the date of retention Raeann was five years old. The District Court found, under the facts of this case, that a five-year-old is too young to have an intent regarding her habitual residence. Although contrary to our finding in *Whiting*, where we held that a four-year-old child is able to acclimate, it does

17

not change the propriety of the District Court's finding as other facts make this determination a correct one.

The record indicates that Raeann had only been in Pittsburgh for a few weeks when the wrongful retention occurred. Additionally, there is no evidence in the record to suggest that any special circumstances existed which would enable her to acclimatize quickly. *Cf. Karkkainen*, 445 F.3d at 295. In fact, the only evidence in the record is that Raeann missed Yang, wanted to return to Canada, and that she was enrolled in school in Pittsburgh. Based on this evidence, it cannot be said that Raeann became "firmly rooted in her new surroundings" prior to the date of retention. *Id.* at 292 (internal quotation marks and citation omitted). Furthermore, neither party argues that Raeann had acclimatized to Pittsburgh at the time of retention, but rather even Tsui agrees that Raeann did not possess an intent regarding her habitual residence. As there is no evidence of acclimatization, that Raeann abandoned Canada as her habitual residence, or that there was a degree of settled purpose from Raeann's point of view, we find that from Raeann's perspective Pittsburgh did not become her habitual residence prior to the date of retention. *See generally Karkkainen*, 445 F.3d at 293-96. In other words, the record would not support a finding that Raeann had been physically present in the United States for an amount of time sufficient for acclimatization and which had a degree of settled purpose from her perspective. *See Feder*, 63 F.3d at 224.

As the record does not reflect Raeann's perspective on her habitual residence, we must focus on the "parents' present, shared intentions." *Baxter*, 423 F.3d at 369 (internal quotation

18

marks and citations omitted). We have said that there can be a change in the habitual residence of a child when the parents have a settled purpose in moving the child even for a limited period of time. *See*, *e.g.*, *Feder*, 63 F.3d at 223. In order for a purpose to be settled there must be "a sufficient degree of continuity." *Id.* (internal quotation marks and citation omitted). Additionally, a child's prior habitual residence must be effectively abandoned by the shared intent of the parents for her to acquire a new habitual residence. *See Mozes*, 239 F.3d at 1082; *Whiting*, 391 F.3d at 550 (explaining that acquiring a new habitual residence implicitly requires the abandonment of the prior habitual residence).

The District Court found that the agreement between the parties was that Raeann would stay with Tsui only until Yang recovered. It rejected Tsui's argument that the parties intended the stay to last until Yang fully recovered, which may have been an extended period of time. Rather, the District Court found that they anticipated that Yang would recover within two to three months. The District Court's finding is supported by the record. First of all, Yang testified that she expected to recover within two to three months. An email from Yang to Tsui reflected this anticipation by saying that she would not be able to work for at least two and a half months. Even though Tsui denied that there was ever a conversation regarding the duration of Raeann's stay during direct examination, an affidavit he submitted in the Canadian custody proceedings indicated that he was aware that Yang expected to recover fully in a couple of months.[13]

---

[13]In his Brief, Tsui states that his medical background made him aware that Yang's surgery and illness would require

19

Therefore, the District Court's determination is plausible in light of the record.

The District Court's finding also comports with the case law. Even though the period was indefinite, it cannot be said that the purpose of Raeann's traveling to the United States possessed "a sufficient degree of continuity to be properly described as settled." *Feder*, 63 F.3d at 223 (internal quotation marks and citation omitted).[14] Rather, the shared intent was that Raeann would remain in the United States only as long as it took Yang to recover, which was anticipated to be two to three months. Additionally, there is no evidence that Yang and Tsui

a much longer period of recovery than she anticipated. This knowledge, he claims, demonstrates that there was no shared intent that the recovery would only take two to three months. As there is nothing in the record that indicates he shared this information with Yang, we find Tsui's outside knowledge irrelevant. The question is shared parental intent, and if Tsui did not share this knowledge with Yang, by definition it offers no insight into such shared intent.

[14]Additionally, because Raeann was five years old when she traveled to the United States to stay with Tsui, she was not what we have categorized as a very young child. *See Whiting*, 391 F.3d at 550-51 (providing that a four-year-old unlike an infant can acclimatize). Therefore, the fact that "shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country," does not apply to the present case. *Karkkainen*, 445 F.3d at 296.

20

intended for Raeann to abandon Canada as her habitual residence. "[E]ven though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred." *Mozes*, 239 F.3d at 1082. The evidence simply does not demonstrate a shared mutual intent to change Raeann's habitual residence.

It is undeniable that Canada was Raeann's habitual residence before she went to stay with Tsui in the United States. As there was no shared mutual intent by the parents for Raeann to abandon that prior residence, we agree with the District Court's determination that Canada was Raeann's habitual residence immediately before she was retained by Tsui on November 20, 2002. Therefore, Yang met her burden of proving Raeann's habitual residence.

Tsui's arguments to the contrary are unpersuasive. First, he claims that the facts do not support the District Court's finding. His claim is based in part on the fact that Yang packed Raeann's summer clothes for her trip to Pittsburgh. As Raeann's trip to Pittsburgh was during the winter, he claims that this indicates that the intent was not limited to merely a two to three month stay. The District Court dismissed the argument by noting Yang's email to Tsui explained that Raeann did not like to wear long sleeves. On appeal, Tsui attacks the District Court's determination because the summer clothes included shorts. However, Tsui ignores the fact that the email also stated that some of the things that she packed were probably

21

unnecessary.[15] Even if we agreed with Tsui that this evidence could support his argument, we will not reverse the District Court's finding because it is supported by the record. *See Karkkainen*, 445 F.3d at 289 (internal quotation marks and citation omitted).

He also points to the fact that Yang helped to enroll Raeann in a Pittsburgh school and that she agreed that even if she recovered sooner Raeann should complete the fall school term in Pittsburgh. The fall term at the school Raeann attended in Pittsburgh did not end until January, a fact which Yang claims she did not learn until after the agreement was made. Even if Yang knew that the term went until January, this is still within two to three months of October, when Raeann began residing with Tsui. Therefore, this fact does not actually help Tsui as it does not contradict the District Court's finding.

Secondly, Tsui attempts to analogize this case to *Karkkainen*. Such an analogy is improper because the facts of

---

[15]Tsui also points to the parties' agreement that Raeann would remain with Tsui if Yang died as evidence that they did not agree that Raeann would only stay with Tsui for a couple of months while Yang recovered. However, the agreement as to what would happen upon Yang's death was a different agreement than the one at issue in this case. As the condition of Yang's death did not arise, that second agreement never came into effect. What the parties intended if Yang did not survive does not reflect what the parties intended during Yang's recovery period. If anything, the second agreement provides further explanation as to why Yang packed summer clothes.

22

the two cases are too dissimilar, and as we have said these types of cases are extremely fact-intensive.[16] Our main focus in *Karkkainen* was on the perspective of the eleven-year-old child who we determined had become acclimatized in the United States. 445 F.3d at 293-97. There is no such evidence in this case. Additionally, the shared intent in that case was that the child could determine, after spending the summer in the United States, whether or not to remain permanently in the United States. *Id.* at 297. Such a mutual intent is nothing like an agreement that a child reside in Pittsburgh for a couple of months until her mother recovered from surgery. Therefore, although the cases share some similar facts, such as the mother assisting with the child being enrolled in school and the packing of items beyond those needed for a short stay, *Karkkainen* does not control the outcome of this case.

---

[16]Tsui's reliance on case law from other jurisdictions suffers from the same flaw. The other cases are factually distinguishable. *See*, *e.g.*, *Koch v. Koch*, 450 F.3d 703, 718 (7th Cir. 2006) (holding Germany was children's habitual residence as parents moved there together with the shared intent to remain for at least three years); *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989) (finding that two-year old's habitual residence changed based on parents' intentions and overt actions, including obtaining a place to stay). In both *Koch* and *Bates*, the parents took steps together to change the habitual residence of the children. That is simply not the facts of this case, and therefore we are not guided by those decisions.

23

As the record and the case law convince us that Canada was Raeann's habitual residence immediately prior to November 20, 2002, the Convention is applicable as she was retained in the United States. *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). However, we must complete the remaining steps of the analysis in order to determine whether the retention was wrongful within the meaning of Article 3.

B.

The next step to consider is whether Yang had custody of Raeann.[17] Custody rights, under the Hague Convention, "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). To make a custody determination, it is necessary to carefully examine "the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country . . . at the time the child was [retained]." *Adan*, 437 F.3d at 391 (internal quotation marks and citation omitted). When the country in which the child habitually resides has "more than one territorial unit, the custody rights laws of the territorial unit apply." *Feder*, 63 F.3d at 221-22 (citing Hague Convention, art. 31).

---

[17]We again note that a determination of custody rights under the Hague Convention is not a determination of who should actually have custody. *See*, *e.g.*, *Adan*, 437 F.3d at 391; Hague Convention, art. 16. Rather, we are only deciding who had custody rights in the country of the child's habitual residence in order to determine whether the child was wrongfully retained under the Convention.

24

Under the Convention custody rights are different than "rights of access." Rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5(b). Rights of access are visitation rights, and the protection afforded for such rights under the Convention is less than that afforded for custody rights. *Adan*, 437 F.3d at 392. When custody rights are violated, a court can order that the child be returned to his or her habitual residence, while a court cannot order the return of a child when access rights are violated. *Id.*

In this case, as Raeann was an habitual resident in Canada, but more specifically British Columbia, British Columbia's law governs the determination of custody rights as defined by the Convention. *See Feder*, 63 F.3d at 221-22. Both parties offered expert testimony on British Columbia custody law, and it is undisputed that its Family Relations Act is applicable. The Act states in pertinent part:

34. Persons who may exercise custody

34(1)

Subject to subsection (2), the persons who may exercise custody over a child are as follows:

(a) if the father and mother live together, the father and mother jointly;

(b) if the father and mother live separate and apart, the parent with whom the child usually resides;

(c) if custody rights exist under a court order, the person who has those rights;

(d) if custody rights exist under a written agreement, the person to whom those rights are given.

34(2)

If persons have conflicting claims to custody under subsection (1), the following persons may exercise custody to the exclusion of the other persons unless a court otherwise orders:

(a) the person who has custody rights under a court order;

(b) if paragraph (a) does not apply, the person granted custody by an agreement;

(c) if paragraphs (a) and (b) do not apply, the person claiming custody with whom the child usually resides. . . .

R.S.B.C. 1996, c. 128, s. 34.

Yang and Tsui both claimed to have custody rights under section 34(1). At the hearing before the District Court, both experts testified that because both parents claimed to have custody rights section 34(2) applies.[18] Therefore, we need to determine which subsection applies. No custody order existed on the date of retention making section 34(2)(a) inapplicable. Tsui argues that an agreement existed making section 34(2)(b) the relevant provision. However, Yang argues that section 34(2)(c) controls in this case.

We will first address whether there was an agreement between Yang and Tsui regarding the custody of Raeann. It is undisputed that prior to Raeann's travel to Pittsburgh, Yang had sole custody of Raeann. That is Yang and Tsui lived separate and apart, and Raeann resided with Yang. *See* R.S.B.C. 1996, c. 128, s. 34(1)(b). Therefore, we need to determine whether, as Tsui claims, there was an agreement between the parties that transferred custody to Tsui.

The experts testified that, like the Convention, the custody laws of British Columbia differentiate between custody rights and visitation rights. According to the experts, a custodial parent is the parent who is entitled to make the major decisions regarding the child and who oversees the day-to-day care of the child, while a non-custodial parent has access or visitation rights. However, both experts testified that a child's "visit" with

---

[18]The District Court applied section 34(1). However, we find that section 34(2) applies because of the conflicting custody claims. The factual determinations made by the District Court enable us to apply section 34(2) in our analysis.

27

the non-custodial parent can be for an extended period of time, such as summer vacation.

There was also testimony regarding what constituted a custody agreement under the Family Relations Act. According to the experts, a custody agreement does not need to be filed with a court or even be memorialized in writing. Rather, an oral agreement or unsigned documents, such as emails, will suffice. However, the main factor according to both experts is whether the custodial parent intended to transfer custody rights to the non-custodial parent. Tsui's expert testified that the determination of whether such an intent existed is a factual determination to be made by a judge. She also explained that factors such as whether the custodial parent authorized the non-custodial parent to make major decisions, such as where to enroll the child in school or what doctors to use, can demonstrate such an intent.

Tsui argues that the evidence in this case demonstrates an agreement to transfer custody of Raeann to him. As proof he points to the authorization that Yang signed which allowed Raeann to travel to Pittsburgh with him. That document simply stated "I authorize Mr. Fu-Chiang Tsui to accompany Raeann Tsui to travel to the United States." Tsui's own expert testified that the authorization was ambiguous and did not clearly transfer custody rights. Because of that ambiguity, she stated, whether the writer intended to transfer custody was a factual determination to be made by a judge. The District Court in this case found that Yang did not intend to transfer custody when she prepared and signed the document. Based on the record, we agree with that determination.

28

Tsui also claims that the general agreement that Raeann stay with him included the transfer of custody rights. Such an agreement necessarily constituted a change of custody, he claims, as it required Tsui to make major decisions regarding Raeann. However, the record does not demonstrate that is true. For example, as Tsui vigorously argued in his Brief regarding the habitual residence determination, Yang participated in the enrollment of Raeann in a Pittsburgh school. And, although Tsui believed that Raeann should remain in the school for the entire fall term even if Yang recovered before then, he sought Yang's approval for that decision. There is evidence in the record that Tsui took Raeann to doctors for a skin condition. However, the record does not indicate that such visits occurred during the relevant time period between October 27, 2002 and November 20, 2002. Nor does the record reflect that Yang had knowledge of such visits or that she approved. The evidence does not demonstrate that Tsui had control over the major decisions regarding Raeann. The requisite intent to transfer custody is absent. Rather, as the District Court determined, "Raeann's trip to the United States was intended by her parents to be an extended visit coextensive with Yang's convalescence and not a transfer of custody for an indefinite period of time." *Yang v. Tsui*, No. 2:03-cv-1613, 2006 WL 2466095, *11 (W.D. Pa. Aug. 25, 2006). Absent an intent by Yang to transfer custody, a requirement that Tsui's expert testified was necessary and to be determined by a judge, it cannot be said that the parties had an agreement as required under section 34(2)(b) to create custody rights in Tsui. Therefore, section 34(2)(b) is inapplicable to this case.

29

We now turn to section 34(2)(c), and we must determine who Raeann usually resided with at the date of retention. On appeal, Tsui does not contest, nor can he, that Raeann usually resided with Yang prior to the date of retention. The District Court held that Raeann usually resided with Yang, and it is clear from the record that it was correct. In fact, for most of her life Raeann resided solely with her mother. From April 2001 until the end of October 2002, Yang and Raeann resided in British Columbia. The time that Raeann spent at Tsui's house in Pittsburgh from October 27, 2002 until November 20, 2002, cannot be said to constitute her "usual" residence. Based on the facts of this case, Yang is clearly the parent with whom Raeann usually resided. Therefore, under section 34(2)(c), Yang had exclusive custody rights within the meaning of the Convention.

C.

As we have determined that Yang in fact had custody of Raeann, we now reach the final question in the wrongful retention analysis: whether she was exercising those rights at the time of retention. Under this prong, Yang's burden is easy because "the test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Baxter*, 423 F.3d at 370 (internal citation omitted). "'[V]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised.'" *Adan*, 437 F.3d at 391 (quoting Hague Int'l Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,507 (Mar. 26, 1986) (hereinafter "Hague Convention Analysis")). The petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep, some sort of regular contact with the

30

child.  *Baxter*, 423 F.3d at 370.  Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights.  *Id.*

The evidence in this case clearly meets the standard. Yang attempted to speak with Raeann whenever possible, even when she was in the hospital.  When she was out of the hospital she spoke with Raeann every day, until Tsui limited the calls to every other day.  Therefore, she kept or attempted to keep some sort of regular contact with Raeann.  Nothing in the record suggests that Yang clearly or unequivocally abandoned Raeann. Therefore, Yang exercised her custody rights.

Tsui argues that Yang was unable to exercise her custody rights because of her illness.  That is, he claims that Yang was not able to take care of Raeann from the end of October 2002 until the date of retention, and even after that period.  However, this is not sufficient to refute Yang's evidence that she exercised her custody rights.  As the test for finding the non-exercise of custody is stringent, Yang's illness simply does not meet that high bar.

## D.

We hold that Yang proved by a preponderance of the evidence that Tsui wrongfully retained Raeann within the meaning of Article 3.  As there was a wrongful retention, the Convention dictates that Raeann must be returned to Canada.

31

Hague Convention, art. 12.[19]  However, the Convention also gives the District Court the discretion to deny such an order for a variety of reasons.  Hague Convention, art. 13.  The respondent has the burden of proving that the child should not be returned for one of the enumerated exceptions listed in Article 13.  *Karkkainen*, 445 F.3d at 288.  If the respondent proves one of the affirmative defenses, it is within the discretion of the District Court to refuse to order the child be returned to his or her habitual residence.  *Id.*

On appeal, Tsui maintains that he proved the "wishes of the child" defense by a preponderance of the evidence and that the District Court abused its discretion by entering the order for Raeann to be returned to Canada despite such proof.  Although we have not previously considered this defense, we believe that the District Court did not err by refusing to apply the defense. Therefore, we will affirm the order mandating that Raeann be returned to Canada despite her desire to remain in the United States.

Article 13 includes what has been called the "wishes of the child" defense or exception. The Convention provides:

> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has

---

[19]As we held in *Yang I*, the "well-settled determination" is not relevant to this case because Yang filed her Petition within one-year of the date of wrongful retention.  416 F.3d at 203 n.4.

32

> attained an age and degree of maturity at which it
> is appropriate to take account of its views.

Hague Convention, art. 13. As with any of the affirmative defenses under the Convention, this defense is to be construed narrowly. *See England v. England*, 234 F.3d 268, 272 (5th Cir. 2000). The exceptions are construed narrowly so their application does not undermine "the express purposes of the Convention." *Feder*, 63 F.3d at 226. Additionally, even if the respondent meets his or her burden of proving the affirmative defense, the court retains the discretion "to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child." *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007) (internal citations omitted); *see also Feder*, 63 F.3d at 226.

Although we have not previously considered this defense, we agree with the analysis used by other courts that have addressed its application. The child's wishes can be the sole reason that a court refuses to order the return of the child to his or her habitual residence. *See Blondin v. Dubois*, 189 F.3d 240, 247 (2d Cir. 1999) (internal citations omitted). However, a "court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis," such as whether the child would suffer a grave risk of harm if returned to his or her habitual residence. *de Silva*, 481 F.3d at 1286.

An analysis of whether to apply the "wishes of the child" exception requires consideration of the goals of the Convention

33

and a determination of whether the child is of sufficient age and maturity for his or her views to be taken into account. *Id.* The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis. "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Id.* at 1287 (internal citation omitted). In making its determination, a court should also consider whether a child's desire to remain or return to a place is "the product of undue influence," in which case the "child's wishes" should not be considered. *Id.* at 1286; *see also* Hague Convention Analysis, 51 Fed.Reg. at 10,509 ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.").

The District Court heard Raeann's testimony *in camera*, and determined that she was "a bright, intelligent and pleasant child." Dr. Paul Bernstein, a psychologist and expert witness used by Tsui, supplied a report in which he also found Raeann to be quite intelligent. Raeann informed Dr. Bernstein that she wanted to stay in Pittsburgh. Her reasons for wanting to stay included liking her school, her preference for living in a house rather than a small apartment, and having friends and brothers. She also explained that she missed her mother and knew that her mother was very sick, but she was happy in Pittsburgh and had lived there for more than three years. Raeann's testimony at the hearing was consistent with her statements to Dr. Bernstein. At the hearing, Dr. Bernstein testified that he did not think that Raeann demonstrated any signs of coercion, although he

34

admitted that her time and experiences with her father had a major impact on her desire to remain in Pittsburgh.

The District Court found that Raeann's testimony did not include particularized objections to returning to Canada, but rather it indicated that she possessed a more generalized desire to remain in Pittsburgh similar to that of any ten-year-old having to move to a new location. She had reasons to support her preference to remain in the United States, but such reasons were not necessarily sufficient to invoke the exception. *See*, *e.g.*, *Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D. P.R. 2004) ("The fact that the [thirteen-year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."). Despite her intelligence and demeanor, the District Court found that Raeann was not of sufficient age or maturity for her views to be appropriately considered. In other words, it found that Tsui failed to meet his burden of proving by a preponderance of the evidence that the "wishes of the child" exception should be applied in this case. Therefore, the District Court declined to apply the exception to prevent Raeann from being returned to Canada based solely on her desire to remain in Pittsburgh. As such a finding is not clearly erroneous, we will not disturb it.[20]

[20]The District Court also found evidence of undue influence. In its view, some of Raeann's statements to Dr. Bernstein demonstrated that she was expressing someone else's opinion. For example, it believed that her statement that the "best school is in Pittsburgh" was mere repetition of what Tsui

35

In addition, the District Court determined that this was not an appropriate case in which to apply the exception. The attachment that Raeann had to Pittsburgh and her family there were created because of Tsui's wrongful retention of Raeann. The three weeks in which Raeann resided with Tsui, but was not wrongfully retained by him, is not the time period during which Raeann grew attached to her family and life in Pittsburgh. Rather, it was the passage of time during the years of wrongful retention and litigation of this case that created Raeann's desire to remain in Pittsburgh. If the District Court applied the exception in this case, it would encourage parents to wrongfully retain a child for as long as possible. A lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home. The application of the exception in this

told her. Dr. Bernstein testified that Raeann's use of the word "best" was not meant in the comparative sense, but rather connoted that she thought her school was great. The District Court rejected that interpretation based on Dr. Bernstein's prior testimony that Raeann was a borderline genius, and it thought it was unlikely that she did not understand the comparative meaning of the word "best." As the record is sufficient to support the District Court's determination that Raeann was not sufficiently mature for a court to appropriately consider her views and that the application of the exception in this case would frustrate the purposes of the Convention, absent a determination of undue influence, it is unnecessary for us to determine whether the suggestion of undue influence in the record was sufficiently strong in this case for Raeann's views to be disregarded on that basis.

case would reward Tsui for violating Yang's custody rights, and defeat the purposes of the Convention. Even if the record supported a finding that Tsui met his burden of proving the applicability of the exception to this case, it cannot be said that the District Court abused its discretion by refusing to apply the exception. Rather, the District Court construed the exception narrowly in order to "effectuate the purposes of the Convention." *Karkkainen*, 445 F.3d at 288. Therefore, we agree with the District Court's refusal to apply the exception in this case, and its order mandating Raeann's return to Canada.

IV.

For the reasons stated above, we agree with the District Court's determination that Tsui wrongfully retained Raeann, and that Raeann should have been returned to Canada despite the "wishes of the child" exception. Therefore, we will affirm the District Court's judgment.

NYGAARD, J., Concurring.

I join Judge Fisher's excellent opinion for the court in its totality and write separately in order to shine a brief spotlight on the alarming absence of alternative dispute resolution practices under the Hague Convention. The concerns we have for children in domestic custody disputes are no different for children caught-up in litigation under the Hague Convention. Tragically, the difficulties parents and the courts face in protecting children from instability and unpredictability are magnified for children involved in Hague Convention litigation because of the cross-border nature of their parents' dispute.

37

Globalization has lead to a dramatic increase in litigation of international family disputes. *See Revised Brussels Regulation II, Council of the European Union*, http://europa.eu.int/eur-lex/pri/en/oj/dat/2003/l_338/l_33820031223en00010029.pdf; Nigel Lowe et al., *A Statistical Analysis of Applications Made in 1999 Under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction Preliminary Document No. 3 of March 2001* (revised version, Nov. 2001), Permanent Bureau of the Hague Conference, http://hcch.e-vision.nl/upload/abd2001pd3e.pdf. I submit that such an increase calls for creating better mechanisms for settling international custody disputes. Of course, discussion of the importance of ADR in international custody dispute litigation is beyond the scope of this concurring opinion. I commend the following article to interested parties in the hope that at some point efforts will be undertaken to alleviate the tragic positions of children who, like Raeann Tsui, are trapped in long and destructive international custody battles: Radoslaw Pawlowski, Note, *Alternative Dispute Resolution For Hague Convention Child Custody Disputes*, 45 FAM. CT. REV. 302 (2007).