NOT RECOMMENED FOR PUBLICATION

File Name: 26a0181n.06

Case No. 25-3636

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

April 21, 2026

KELLY L. STEPHENS, Clerk

ILYSE DERAVIL; LEGRAND DERAVIL, )
)
    Petitioners - Appellants )
)
    v. )
)
)
JULMISE JEAN; JOHNNY JEAN-LOUIS, )
)
    Respondents - Appellees. )
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

UNSEALED OPINION[*]

Before: McKEAGUE, GRIFFIN, and THAPAR, Circuit Judges.

McKEAGUE, J., delivered the opinion of the court in which THAPAR, J., concurred. GRIFFIN, J. (pp. 17–29), delivered a separate dissenting opinion.

McKEAGUE, Circuit Judge. This case, brought under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), involves a complicated dispute between two couples who are fighting over A.D., a minor. Petitioners—Ilyse and Legrand Deravil—are A.D.'s grandaunt and granduncle. Respondents—Julmise Jean and Johnny Jean-Louis (together referred to as the "Jean-Louises")—are A.D.'s mother and father.

---

[*]On April 21, 2026, the court filed the opinion and judgment in this case under a temporary seal and granted the parties 14 days to file motion(s) to redact privileged information. With no timely motions to redact having been filed as of May 8, 2026, the court unsealed the opinion and judgment bearing the original file date.

A.D. was living in Martinique with the Deravils. In 2023, she went to visit the Jean-Louises in the United States. But what was supposed to be a temporary visit turned into an indefinite stay. The Deravils claim the Jean-Louises improperly retained A.D. in the United States in violation of their custody rights. So the Deravils filed this petition under the Hague Convention, seeking A.D.'s return to Martinique. The district court determined that the Deravils established a prima facie case for wrongful removal or retention, but it nonetheless denied the petition due to the Hague Convention's age-and-maturity exception, finding that A.D. objected to repatriation. The Deravils appealed. Because we find no clear error or abuse of discretion in the district court's decision, we AFFIRM.

## I. BACKGROUND

### 1. Factual Background

A.D. was born in Haiti around the start of 2012.[1] From 2012 to 2015, the Deravils and the Jean-Louises lived in close proximity in Haiti. But in 2015, the Deravils took A.D. to Martinique, where A.D. would live for the next eight years. The Jean-Louises did not see A.D. over that eight-year span, but they did have monthly phone calls with her. Meanwhile, the Jean-Louises also left Haiti. They lived in Chile and Mexico before moving to the United States in 2021 and settling in Ohio.[2]

---

[1] The Jean-Louises claim A.D. was born in December 2011; the Deravils claim it was January 2012. A.D.'s precise birthday is irrelevant for purposes of this appeal.

[2] The Jean-Louises obtained Temporary Protected Status ("TPS") as Haitian nationals. They have since applied for TPS on behalf of A.D. as well. After briefing in this matter concluded, the Department of Homeland Security announced that it would terminate TPS for Haitian nationals as of February 3, 2026. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733 (Nov. 28, 2025). This administrative act has been stayed under 5 U.S.C. § 705. *Miot v. Trump*, No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026). The Supreme Court will review this stay, with oral argument held on April 29, 2026.

In 2023, the couples arranged for A.D. to visit the Jean-Louises in the United States. The agreed-upon plan was for A.D. to spend the summer with the Jean-Louises in Ohio then go back to Martinique. That did not happen.

The Jean-Louises, who maintain that the Deravils originally kidnapped A.D. back in 2015, never intended on returning A.D., hoping she would remain with them in Ohio. But when the Deravils learned of the Jean-Louises' intentions to retain physical custody over A.D. in the United States, they took matters into their own hands and attempted to sneak A.D. back to Martinique. The Jean-Louises intervened by calling the police, who intercepted Ilyse Deravil and A.D. in Florida as they were on their way out of the country. A.D. went back to live with the Jean-Louises. This lawsuit followed.

## 2. Procedural History

On July 19, 2024, the Deravils filed a petition under the Hague Convention seeking A.D.'s return to Martinique. After discovery, the parties filed cross motions for summary judgment. The couples both claimed to have custody of A.D., with each purporting to have A.D.'s true birth certificate. One lists the Deravils as A.D.'s parents while the other lists the Jean-Louises.

As summary judgment briefing concluded, the Jean-Louises filed a motion asking the district court to interview A.D. *in camera*. Specifically, the Jean-Louises argued that an *in camera* interview would allow the district court to determine whether A.D. objected to repatriation and was sufficiently mature to have her views considered. If so, the age-and-maturity exception could apply and serve as the sole basis for denying the Deravils' petition. The Deravils opposed, arguing that the Jean-Louises waived this defense and had not yet met their burden to establish the age-and-maturity exception, so an *in camera* interview would be improper. The Deravils focused on whether or not the Jean-Louises had (at that point) put forth sufficient evidence to support this defense; they did not claim that A.D. lacked the requisite maturity or that she would find repatriation acceptable, even if not preferred.

3

The district court granted the Jean-Louises' motion for an *in camera* interview, first explaining that the Jean-Louises did not waive the defense. Then the district continued, stating that the Deravils' opposition to the interview due to an incomplete record "put[s] the cart before the horse—indeed, the purpose of an *in camera* interview would be to answer" whether the Jean-Louises could meet their burden to establish the age-and-maturity exception. R.54 at PageID 1574. Even though the parties had completed discovery and briefing on their cross motions for summary judgment, the district court recognized the gravity of the case and the impact it would have on A.D.'s life, so it decided an *in camera* interview would be helpful.

On June 5, 2025, nearly a year after the Deravils filed their petition, the district court interviewed A.D. The interview consisted of the district court asking A.D. a series of questions focused on her time in Martinique with the Deravils and her subsequent experience in the United States. A Haitian-Creole interpreter was present for the interview, but A.D. did not end up needing assistance.

About a month later, the district court held oral argument on the cross motions for summary judgment. The Deravils knew the district court was considering the age-and-maturity exception— and that it would base its analysis (at least in part) on the *in camera* interview. Nonetheless, at the hearing, the Deravils did not claim A.D. lacked the requisite maturity for the exception to apply, nor did they attempt to strengthen their position regarding A.D.'s potential objection to repatriation; in fact, the Deravils did not mention the age-and-maturity exception at all. Notwithstanding that the Deravils are correct that the Jean-Louises bore the burden to prove the exception, and that they had not yet seen the transcript of the interview, it is telling that the Deravils never presented evidence (including affidavits based on their own observations from raising A.D. for eight years) showing that A.D. lacked maturity, and despite interacting with A.D. while she was visiting the Jean-Louises (through phone calls and the eventual trip to take A.D. back to Martinique), the Deravils did not claim A.D.'s demeanor signaled she would have found repatriation acceptable. Simply put, in their motion opposing the *in camera* interview and at the summary judgment hearing, the Deravils had the opportunity to present evidence undermining the

application of the age-and-maturity exception, but they chose not to do so. They also never requested a separate hearing to address the age-and-maturity exception.

Less than a week after oral argument, the district court ruled in favor of the Jean-Louises. The district court determined that the Deravils established a prima facie case for wrongful retention, but based on the *in camera* interview and some corroborating medical records, the district court found that A.D. satisfied the age-and-maturity exception by preponderance of the evidence, which justified denial. The Deravils did not file post-judgment motions seeking the opportunity to supplement the record; instead, they filed this appeal.

## II. STANDARD OF REVIEW

"We review the [grant of] summary judgment de novo but the court's findings of specific facts for clear error." *Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 636 (6th Cir. 2009). The Deravils argue that we should review the district court's factual findings related to the age-and-maturity exception de novo. In effect, the Deravils ask us—in this appellate posture—to make a first-instance determination as to whether the age-and-maturity exception is satisfied based on the same record the district court relied upon, conceding that "[t]he transcript of A.D.'s *ex parte* interview is the only piece of evidence that this Court needs to review." Appellant Br. 31, D.19. The Deravils consider the record complete; they merely disagree with the district court's conclusion, and they ask us to review it de novo.

But that's not how we review factual findings. In the context of Hague Convention petitions, our circuit "reviews the district court's findings of fact for clear error." *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007) (cleaned up) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)); *see also Selame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022). So, because the age-and-maturity exception is a factual finding, we utilize clear-error review. *Simcox*, 511 F.3d at 604 ("Whether a child is mature enough to have [his or her] views considered is a factual finding, and as such, the district court is entitled to deference [through clear error review]." (citing *Friedrich*, 78 F.3d at 1064)); *see also Moreno v. Zank*, 895 F.3d 917, 926 (6th Cir. 2018)

(explaining the "fact-intensive" nature of the age-and-maturity exception, calling for "specific and detailed fact-finding by the district court"); *Monasky v. Taglieri*, 589 U.S. 68, 84 (2020) ("Clear-error review has a particular virtue in Hague Convention cases. As a deferential standard of review, clear-error review speeds up appeals and thus serves the Convention's premium on expedition.").

## III. ANALYSIS

Because the district court determined the Deravils established a prima facie case, this appeal boils down to our whether or not the district court correctly denied the petition solely due to the age-and-maturity exception. The age-and-maturity exception is one of "the narrow exceptions set forth in the [Hague] Convention" that can justify denying a wrongful-removal petition. 22 U.S.C. § 9001(a)(4). A district court has the authority to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention, art. 13.

The age-and-maturity exception involves two distinct factual findings. First, the district court must make a factual finding as to whether the child is mature enough for his or her wishes to be given weight. *Simcox*, 511 F.3d at 604. Second, the district court must make a factual finding as to whether the child has actually objected to repatriation—a mere preference against returning to the country of habitual residence will not suffice. *See, e.g.*, *Custodio v. Samillan*, 842 F.3d 1084, 1089-90 (8th Cir. 2016); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007); *de Silva v. Pitts*, 481 F.3d 1279, 1286-87 (10th Cir. 2007); *Neumann v. Neumann*, 310 F. Supp. 3d 823, 835-36 (E.D. Mich. 2018); *Olson v. Olson*, 185 F. Supp. 3d 1021, 1032-33 (M.D. Tenn. 2013).

Under clear error review, we leave the district court's factual finding intact "unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Taglieri v. Monasky*, 907 F.3d 404, 408-09 (6th Cir. 2018) (en banc), *aff'd*, 589 U.S. 68 (2020) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). To reverse for clear error, a mistake

must "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Id.* at 409 (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)).

Notably, Congress intentionally imposed a lower burden of proof for respondents to establish that the age-and-maturity exception applies. ICARA, the legislation that establishes the procedures by which courts consider Hague Convention petitions, requires that respondents meet the far-from-daunting preponderance standard to successfully mount an age-and-maturity-exception defense. 29 U.S.C. § 9003(e)(2)(B). In contrast, Congress imposed the more demanding clear-and-convincing burden of proof on the separate and distinct grave-risk exception. *Id.* at § 9003(e)(2)(A). Congress's decision to assign this lower burden of proof on the age-and-maturity exception informs our analysis as to whether the district court committed clear error; it is harder to show clear error when the district court's findings are subject to a lower burden of proof. *Cf. Easley v. Cromartie*, 532 U.S. 234, 241, 257 (2001); *Cooper v. Harris*, 581 U.S. 285, 337 (2017) (Alito, J., concurring in part) ("The heavier a [party's] evidentiary burden, the harder it is to find that [the party] ha[s] carried their burden—and the more likely that it would be clearly erroneous to find that they have.").

## A. A.D.'s Maturity

The district court found that A.D., who was 13 years old at the time of the *in camera* interview, was sufficiently mature to contribute to the proceedings. The district court considered A.D.'s demeanor, whether she understood the difference between the truth and a lie, her ability to recall and narrate, and whether she fully grasped the purpose and significance of the proceedings, as is proper for this analysis. *See Simcox*, 511 F.3d at 604 (noting that the child's age is not dispositive); *see also de Silva*, 481 F.3d at 1287 (collecting cases); *Djeric v. Djeric*, No. 2:18-cv-1780, 2019 WL 1046893, at *6 (S.D. Ohio Mar. 5, 2019) (considering the child's demeanor).

The district court determined that A.D. was polite with appropriate demeanor. A.D. followed instructions, understood the importance of telling the truth, and recalled important details of her interactions with the adults in her life, even if it took the district court prompting her with

specific questions. Even as we construe these exceptions narrowly, *see* 22 U.S.C. § 9001(a)(4), it would be improper to require much more from a 13-year-old; the exception requires maturity, not fully developed adult-like behavior. *See* Hague Convention, arts. 4, 13 (explaining that the exception applies to a child who is under the age of 16 and displays a "degree of maturity" that warrants taking his or her views into account). And, as Appellants' counsel acknowledged at oral argument, initial reticence and one-word responses to questions are far from unusual for a 13-year-old in their conversations with adults.

As the Deravils argue, there are certain interactions during the *in camera* interview that call A.D.'s maturity into question. For example, at the beginning of the interview, A.D. had trouble recalling when she started going to school in Ohio. She similarly had trouble remembering her life in Haiti (which, in fairness, was only from her birth through age three). And A.D.'s responses were brief and inconsistent at times. She admitted that she did not know what the case was about, and she was clearly confused by some of the district court's questions.

But the district court acknowledged those points, recognizing that A.D. was nervous at first and did not quite grasp the significance of the Hague Convention proceedings. Importantly, A.D.'s initial angst and ignorance to the legal implications of the interview are not dispositive. Judging a child's maturity is a "fact-intensive and idiosyncratic" inquiry that requires a holistic evaluation. *Simcox*, 511 F.3d at 604 (quoting *de Silva*, 481 F.3d at 1287). And while we are limited to words on a transcript in our appellate posture, the district court had the benefit of interacting with A.D., and was thus "in a much better position to judge [her] maturity." *Id.*

A.D. settled into the interview, and she eventually became more confident and comfortable. She even corrected the district court judge on certain details. A.D. was able to discuss specific interactions with the Jean-Louises and the Deravils, and she could differentiate her quality of life in each couple's care. Additionally, the district court judge clearly had reference points for evaluating a child's maturity; he wanted to make A.D. feel comfortable in the interview, so he interacted with her in a manner similar to the way he interacts with his granddaughters. The district court judge understood how 13-year-olds act in light of the circumstances.

We should "accord great deference to the [district] court's findings based on" the "opportunity to observe" A.D. *See de Silva*, 481 F.3d at 1287-88. In interacting with A.D., the district court was satisfied that she was mature enough for her views to be considered. Given the preponderance burden of proof, the district court's reasonable conclusions based on its interactions with A.D., and the fact that throughout the course of this litigation the Deravils failed to point to any evidence—beyond the transcript—showing A.D. lacked the proper degree of maturity, we are not left with a definite and firm conviction that the district court made a mistake sufficient to warrant reversal based on clear-error review.

Additionally, as the record indicates, other adults have also described A.D. as sufficiently mature enough to be credible. In A.D.'s medical records, health care professionals describe A.D.'s attention as "age appropriate," characterizing her interactions with examiners as "congruent with her chronological age." R.57-1 at PageID 1598. Thus, the record, as a whole, supports the district court's finding that A.D. was mature for purposes of the exception, so the district court did not commit clear error. *See Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").[3]

---

[3] We decline the invitation to engage in the dissent's de novo review of the district court's factual findings. Tellingly, the dissent cites a number of cases from our sister circuits in its discussion of A.D.'s maturity; all of them affirm the respective district court, deferring to its factual findings and interactions with the child. *Yang*, 499 F.3d at 279 ("As [the district court's] finding is not clearly erroneous, we will not disturb it."); *Avendano v. Balza*, 985 F.3d 8, 16 (1st Cir. 2021) ("We conclude that in its analysis of a wrenching set of circumstances, the district court did not clearly err . . . ."); *Diaz-Alcarcon v. Flandez-Marcel*, 944 F.3d 303, 315 (1st Cir. 2019) ("Sure, maybe the district judge could have made different credibility findings or weighed the evidence differently. But that does not make her at-issue findings clearly erroneous . . . . [W]e cannot reverse . . . even if we would have reached a different conclusion . . . ."); *Blondin v. Dubois*, 238 F.3d 153, 166-68 (2d Cir. 2001) *abrogated by Golan v. Saada*, 596 U.S. 666 (2022) (affirming the district court's factual findings, although "not reach[ing] the question of whether [the child] attained an age and degree of maturity sufficient for her views to be *conclusive*" (emphasis in original)); *Alvarez Romero v. Bahamonde*, 857 F. App'x 576, 582-84, 587 (11th Cir. 2021) (recognizing that the child was unable to recall certain details, but nonetheless affirmed, explaining that an appellate court "will not displace the district court's factual findings when its account of the evidence is plausible in light of the entire record,

**B. A.D.'s Objection to Repatriation**

After finding that A.D. was sufficiently mature, the district court determined that A.D. provided a particularized objection to returning to Martinique. To make this finding, the district court once again relied on its *in camera* interview with A.D., in which A.D. (1) said she felt unsafe in Martinique, (2) recalled Legrand beating her with a stick, and (3) said she felt like she did not belong in Martinique.

As discussed above, the child must object to repatriation. There are no magic words that indicate an objection rather than a preference; district courts should look to the substance of a child's statements. *Rodriguez v. Yanez*, 817 F.3d 466, 477 (5th Cir. 2016). If the child would be happier in one country, but would acquiesce to life in the other, then he or she has not *objected* to repatriation. *Id.* at 476-77. In communicating his or her objection, the child must provide particularized reasons as to why returning to his or her country of habitual residence is unacceptable.

With only a few examples in which courts have been confronted with Hague Convention decisions relying solely on the age-and-maturity exception, we look for guidance from similar cases in our sister circuits. We recognize that each age-and-maturity-exception decision relies on case-specific, "idiosyncratic" factors, but looking to comparator cases helps establish the principles and essential considerations that guide an age-and-maturity-exception analysis. *See Simcox*, 511 F.3d at 604 (quoting *de Silva*, 481 F.3d at 1287).

One helpful case that shows an example of a particularized objection is *Custodio v. Samillan*, an Eighth Circuit decision analyzing the age-and-maturity exception. In *Custodio*, the child said that he feared his father (who filed the return petition) due to prior instances in which

---

even if [it] would have weighed the evidence differently and even where there may be inconsistencies in the record"). The dissent cites one Florida state appellate court decision that reversed the trial court due to a child's "generic and near-sighted responses" that "provided no significant testimony as to her life in Mexico or how life in Mexico differed from life in the United States." *De La Cruz v. Garcia*, 398 So. 3d 429, 434-35 (Fla. Dist. Ct. App. 2024). Distinct from *De La Cruz*, A.D. was able to discuss how her life in the United States was different than life in Martinique.

his father had "struck him and his brother." 842 F.3d at 1090. The child felt unsafe in his father's custody and would avoid him even if ordered to repatriate to Peru. *Id.* at 1091. The child also discussed how he did not have ties to Peru—he did not have friends there and barely had a relationship with his father. *Id.* These statements from the child were sufficient to constitute an objection. *Id.* The child identified specific reasons as to why he did not want to return, and the reasons were related to safety and a sense of belonging. *Id.* The child showed why repatriation was, in his mind, unacceptable. *Id.*

Another helpful case, showing when a child failed to make a particularized objection, is *Tsai-Yi Yang v. Fu-Chiang Tsui*, from the Third Circuit. In *Yang*, the child wanted to remain in the United States but did not provide a particularized objection to returning to Canada. 499 F.3d at 279. The child only discussed "a more generalized desire to remain in [the United States] similar to that of any ten-year-old having to move to a new location." *Id. Yang* affirmed the district court's finding that this was insufficient to constitute an objection. The child did not show why repatriation could be considered unacceptable as opposed to merely undesirable. *Id.*

A.D.'s statements are more similar to those that constituted an objection in *Custodio*. In responding to the district court's questions in the *in camera* interview, A.D. answered that she did not feel safe in Martinique and did not belong there. She discussed Legrand hitting her with a stick and threatening another child with a machete. She talked about how she enjoys her life in the United States with her birth parents and has a sense of community. But she also specifically noted that she did not want to return to Martinique—the United States was not the better of two satisfactory options, she felt "bad" about repatriation and said she objected to a forced return. R.74 at PageID 1779-80.

Even if A.D.'s instinctual answers seemed guarded at times, when the district court asked for additional information, A.D. remained consistent in her characterization of life in Martinque.

11

She did not feel safe; she felt bad; and she did not feel as if the Deravils were taking care of her.[4] To the district court, A.D. considered a return to Martinique unacceptable.

For sure, there were moments in which A.D. failed to succinctly summarize her objection to repatriation. When the district court asked why A.D. did not want to return to Martinque, she simply stated, "I don't like [the Deravils]." *Id.* at PageID 1780. And when the district court asked A.D. to "put some meat on th[e] bones" of that answer with any specific reasons or details, A.D. replied "no." *Id.* On its face, based solely on the transcript, this does not seem like a particularized objection. But in interacting with A.D., the district court found additional meaning from her answers; and the district court's conclusions are supported by the record.

We are no rubber stamp for the district court, but we are also not a court of first impression when it comes to factual findings. We give considerable deference to the district court here, as "the district court's finding that a child has or has not objected is a 'fact-intensive' determination that is based in part on the court's personal observations of the child." *Custodio*, 842 F.3d at 1089. Attempts to read between the lines of a transcript are limited in value in this context. We cannot decipher tone or body language from words on page; the transcript inherently presents an incomplete picture. Instead, it is the district court that was in the best position to understand what A.D. meant by her statements.

"[W]e must let district courts do what district courts do best—make factual findings—and steel ourselves to respect what they find. While we review transcripts for a living, they listen to witnesses for a living." *See Taglieri*, 907 F.3d at 408. Here, the district court understood A.D.'s objection to be based on the particularized reasons she discussed earlier in the interview: feeling unsafe in Legrand's custody due to previous violent episodes and feeling like she did not belong

---

[4] Notably, while the Deravils broadly suggest that some of A.D.'s answers may have been informed by conversations with the Jean-Louises, the Deravils do not argue that A.D.'s opinions on and descriptions of her time in Martinique were informed by anything other than first-hand experiences. They did not sufficiently call into question the district court's determination that A.D. was free from undue influence that could have undermined her objection.

in Martinique. These particularized reasons are sufficient to constitute an objection under the age-and-maturity exception. *See Custodio*, 842 F.3d at 1090-91.

The district court did not clearly err in finding that A.D. objected to returning to Martinique, which, as discussed above, was merely subject to the preponderance burden of proof. 22 U.S.C. § 9003(e)(2). Between A.D.'s statements during the *in camera* interview, the medical documents that corroborate Legrand's abuse (and A.D.'s reluctance to discuss the abuse in detail), and the fact that the Deravils offer no evidence showing A.D. would have found a return to Martinique acceptable (even if not preferred), the record supports A.D.'s particularized objection to repatriation, so we find no clear error. *See Anderson*, 470 U.S. at 573. We cannot diminish the deferential nature of clear-error review when the district court makes a close call; when "[f]aced with [a] two-sided record," district courts have "the authority to rule in either direction," and "we have no warrant to second-guess [a district court's] well-considered finding" in this context. *See Taglieri*, 907 F.3d at 409.[5]

*     *     *

Apart from whether or not the record supported the age-and-maturity finding, the Deravils also argue that the district court applied the incorrect legal standard. They fault the district court for not applying the "stricter standard" that some of our sister circuits have referenced when the age-and-maturity exception serves as the sole basis to deny a Hague Convention petition. But even though the Second, Third, Eighth, and Tenth circuits reference the importance of applying a "stricter standard" in this context, none of them actually define what that "stricter standard" entails. *See, e.g.*, *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001), *abrogated by Golan v. Saada*, 596

---

[5] Only one of the appellate cases the dissent relies upon in its particularized-objection analysis actually reversed the district court: *Dubikovskyy v. Goun*, 54 F.4th 1042 (8th Cir. 2022), in which the Eighth Circuit reversed the district court because there was no evidence of a particularized objection in the record. "[W]hen asked why she would be 'unhappy' or 'dissatisfied' if she had to go back to Switzerland, [the child] consistently responded with reasons why she preferred to stay in Missouri," never actually explaining why repatriation was unacceptable. *Id.* at 1049. Unlike the child in *Dubikovskyy*, A.D. provided the district court with reasons why she objected to repatriation.

13

U.S. 666 (2022); *Yang*, 499 F.3d at 278; *Custodio*, 842 F.3d at 1089; *de Silva*, 481 F.3d at 1286. Nor do various district courts which similarly reference a stricter standard for the age-and-maturity exception. *See, e.g.*, *Ochoa v. Suarez*, No. 1:15-CV-1104, 2016 WL 6956609, at *2 (W.D. Mich. Nov. 29, 2016); *Boa-Bonsu v. Owusu*, No. 2:25-CV-00632, 2025 WL 2896377, at *8–11 (S.D. Ohio Oct. 10, 2025).

This "stricter standard" does not refer to the burden of proof needed to establish that the age-and-maturity exception applies; as indicated above, ICARA codifies a preponderance of the evidence standard. 29 U.S.C. § 9003(e)(2)(B). Nor does it refer to appellate courts' standard of review. Even when our sister circuits have purported to apply the "stricter standard," they still review the district court's findings for clear error. *See, e.g.*, *de Silva*, 481 F.3d at 1287-88 ("accord[ing] great deference to the [district] court[]" and affirming because there was "no error" in the decision below); *Yang*, 499 F.3d at 279 (concluding that the district court's decision was "not clearly erroneous"); *Custodio*, 842 F.3d at 1089-90 ("Clear error is appropriate because the district court's finding that a child has or has not objected is a 'fact-intensive' determination that is based in part on the court's personal observations of the child."). And the Deravils, both in their briefs and when prompted at oral argument, offer no guidance—nor suggestion—as to what the "stricter standard" may mean.

This "stricter standard" is undefined, and it does not seem to explicitly impact courts' analysis of whether a child meets the age and maturity requirement. After acknowledging the supposed need to apply the "stricter standard," courts do not reference it again in their subsequent analysis of a child's testimony. *See, e.g.*, *Custodio*, 842 F.3d 1084, 1089–91; *Tsai-Yi Yang*, 499 F.3d at 278–79;[6] *Ochoa*, 2016 WL 6956609, at *2; *Boa-Bonsu*, 2025 WL 2896377, at *8–11;

---

[6] The dissent cites *Yang* for the proposition that the "stricter standard requires greater scrutiny of th[e] evidence." But it is unclear how *Yang*'s singular, passive reference to this "stricter standard" supports the dissent's novel interpretation of a district court's responsibilities—particularly when *Yang* makes no mention of any requirement for the district court to engage in "greater scrutiny of th[e] evidence," and such a requirement would contravene the preponderance standard Congress established for this analysis.

*Davis v. Lake*, 647 F. Supp. 3d 482, 494–95 (W.D. Va. 2022); *Babcock v. Babcock*, 503 F. Supp. 3d 862, 880–81 (S.D. Iowa 2020); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 915 (N.D. Ill. 2015); *de Jesus Joya Rubio v. Alvarez*, 526 F. Supp. 3d 1186, 1204–06 (S.D. Fla. 2021). So even though "decisions applying the age and maturity exception are understandably disparate," courts treat the "stricter standard" more as a rote observation than as a rule to be applied in considering a child's testimony. *de Silva*, 481 F.3d at 1287.

Neither the Hague Convention nor ICARA explicitly impose a "stricter standard" in this context. *See* Hague Convention art. 13; 29 U.S.C. § 9003(e). And because the Deravils have not identified how applying the "stricter standard" would have dictated a different outcome, the district court's failure to mention *Blondin* and its "stricter standard"-progeny does not constitute clear error. Whether or not our circuit should adopt (and define) the "stricter standard" is a question we leave for a case that demands its answer.

### C. Discretionary Return

As both parties acknowledge, the age-and-maturity exception can serve as the sole basis to deny a return petition. Hague Convention, arts. 13, 18; *see also, e.g.*, *Yang*, 499 F.3d at 278. But even when the district court determines the exception applies, it can still use its discretion to grant the petition and order repatriation "if return would further the aims of the Convention." *Friedrich*, 78 F.3d at 1067. Here, the district court determined that returning A.D. to Martinique would not advance those aims.

We review this decision for abuse of discretion. *Custodio*, 842 F.3d at 1091. "A district court abuses its discretion when it uses an erroneous legal standard, applies the law improperly, or relies on clearly erroneous factual findings." *HRT Enter. v. City of Detroit*, 162 F.4th 810, 814 (6th

---

Similarly, the dissent's out-of-context references to insurance law and criminal confessions are unpersuasive in our analysis of the Hague Convention.

Cir. 2025). It is a highly deferential standard. *Nationwide Recovery, Inc. v. City of Detroit*, 163 F.4th 977, 987 (6th Cir. 2026).

The district court identified the Hague Convention's purpose of promoting the prompt return of children who have been subjected to self-help retention. The district court denied the petition, leaning on another principle embedded in the Hague Convention: children of sufficient maturity need not be returned to a country against their will. *See, e.g.*, *Rodriguez*, 817 F.3d at 475; *de Silva*, 481 F.3d at 1286. The district court did not abuse its discretion in making a decision that the Hague Convention endorses. Hague Convention, art. 13; *see also* Elisa Perez-Vera, *Explanatory Report: Hague Convention of Private International Law*, ¶ 30 ("[T]he Convention also provides that the child's views concerning the essential question of [his or her] return of retention may be conclusive . . . . [T]he Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of [sufficient age and maturity] should be returned against [his or her] will."). Thus, we uphold the district court's decision to deny the petition based on the age-and-maturity exception.

## IV. CONCLUSION

For these reasons, we **AFFIRM**.

GRIFFIN, Circuit Judge, dissenting.

The International Child Abduction Remedies Act (ICARA) implements the Hague Convention and its default rule of return.[1] 22 U.S.C. §§ 9001–9011. Exceptions to that rule are exceedingly narrow and apply only in "extraordinary cases." *Friedrich v. Friedrich*, 983 F.2d 1396, 1403 (6th Cir. 1993). This is not one of them.

The district court, the majority, and I agree that the Deravils established a prima facie case under the ICARA for A.D.'s return. Specifically, in support of their petition for the return of the abducted child, the Deravils proved: (1) A.D. was a habitual resident of Martinique; (2) the Deravils held custody rights over A.D. under French law and were exercising them just before her wrongful removal; and (3) A.D. was removed and retained by the Jean-Louises in breach of those rights. Also, and importantly, by the time of her in camera interview, A.D. had been wrongfully retained by the Jean-Louises for nearly two years. The district court nonetheless denied the Deravils' return petition based solely upon the age-and-maturity exception. The majority affirms. In doing so, the majority, like the lower court, commits an error of law in failing to apply the "stricter standard" adopted by three of our sister circuits when the maturity exception is the sole basis for denying return. *See Yang v. Tsui*, 499 F.3d 259, 278–80 (3d Cir. 2007) (applying the "stricter standard" and holding that the child's objection was a product of the wrongful retention itself, such that crediting it would "reward" the abducting parent and "defeat the purposes of the Convention"); *Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016); *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007).

---

[1] I refer to the ICARA and the Hague Convention interchangeably.

Without a stricter standard, the threshold is low enough that the wrongful retention itself can produce the purported maturity evidence that defeats the petition, rewarding the abducting parent and undermining the Hague Convention's core purpose. *See Yang*, 499 F.3d at 280 (observing that "a lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings" and "create [the] desire" to stay). A stricter standard guards against that result. Although the burden of proof remains a preponderance of the evidence, the stricter standard requires greater scrutiny of that evidence. In particular, it requires strong evidence of the child's maturity, and scrutiny in the inquiry—fundamentally, the standard requires that the district court probe deeply enough to distinguish the child's genuine independent judgment from the predictable byproduct of a lengthy wrongful retention. *See id.*

There are many other contexts in which greater scrutiny is employed when the circumstances producing the evidence give reason to question its reliability or independence. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (holding that a conflict of interest must be weighed as a factor requiring closer scrutiny of an ERISA plan administrator's denial of benefits); *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379, 381–82 (6th Cir. 2005) (holding that when an insurer's benefits denial rests on evidence generated by conflicted physicians, courts must view the insurer's rationale "with some skepticism"); *Miller v. Fenton*, 474 U.S. 104, 110, 115–16 (1985) (explaining that "the voluntariness of a confession," a question of law, requires "independent federal determination," to ensure the confession was "the product of a free and rational will"). That scrutiny is all the more essential when the evidence in question is a child's own statements, given children's particular susceptibility to the environments and influences that surround them. *See, e.g.*, *J.D.B. v. North Carolina*, 564 U.S. 261, 264, 272–73 (2011) (holding that a child's age "informs the *Miranda* custody analysis" because children are "vulnerable [and]

18

susceptible to outside pressures" and "possess only an incomplete ability to understand the world around them" (citation modified)). No such scrutiny was applied here.

And while the precise contours of the stricter standard under the ICARA have not been reduced to a rigid test, its principal purposes are clear enough to recognize the district court fell short of it. The majority's perfunctory review of the evidence does not correct the error. On the contrary, although it denies "rubber stamping" the district court's findings, it in fact has done so in applying its "five-week old, unrefrigerated dead fish" standard of review. Such a result is especially troubling in this child abduction case that the majority terms a "close call."

Irrespective of the legal error that itself necessitates reversal and remand, we review the district court's factual findings for clear error. And while the standard is deferential, it nonetheless is a meaningful standard of review. *See Indmar Products Co., Inc. v. C.I.R.*, 444 F.3d 777–79, 784 (6th Cir. 2006). After all, just "because our review must be deferential does not mean our review must also be inconsequential." *Moon*, 405 F.3d at 379 (applying arbitrary-and-capricious review in the ERISA context). Here, the district court clearly erred, and I am left with "a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). I therefore respectfully dissent.

## I.

Although the age-and-maturity exception bears the word "age" in its title, the Hague Convention deliberately chose not to set a maturity threshold based on age, because maturity does not necessarily arrive on a specific birthday. *Yang*, 499 F.3d at 279; *Avendano v. Balza*, 985 F.3d 8, 13 (1st Cir. 2021). Instead, the Hague Convention demands that a child display the cognitive, emotional, and communicative capacity to form and articulate sufficiently complex views, and, if she makes that showing, the child must offer particularized objections sufficient to except the Hague Convention's default rule of return. *Custodio*, 842 F.3d at 1089–91.

A.

Maturity may be demonstrated in many ways. Three non-exhaustive markers inform this assessment: the child's ability to engage meaningfully with questions posed by the district court, to offer reasoned comparisons between life in the habitual residence and life in the new country, and to express views of her own. *Jimenez Blancarte v. Ponce Santamaria*, 2020 WL 38932, at *7 (E.D. Mich. Jan. 3, 2020); *Díaz-Alarcón v. Flandez-Marcel*, 944 F.3d 303, 309 n.12 (1st Cir. 2019) ("Importantly, [the child] had positive and negative things to say about her life [in her country of habitual residence], which showed that it was not a black-and-white decision but rather one that she had weighed and considered."); *Yang*, 499 F.3d at 280. None is present here.

1.

A mature child engages meaningfully with questions. She does this by understanding the questions put to her and understanding the proceedings themselves. *Blondin v. Dubois*, 238 F.3d 153, 167 (2d Cir. 2001), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022); *Sadoun v. Guigui*, 2016 WL 4444890, at *10 (S.D. Fla. Aug. 22, 2016) (finding maturity where the children "exhibited a depth and breadth of conversation that belied their age"). For example, a mature child speaks "thoughtfully and expressively" about her views concerning the dispute and where she wishes to live and why. *Blondin*, 238 F.3d at 167; *Alvarez Romero v. Bahamonde*, 857 F. App'x 576, 583–84 (11th Cir. 2021). On the other hand, maturity is doubtful where a child responds only "in head nods and one-word sentences" and, when questioned further, cannot elaborate on what she thinks of the proceedings. *Dalsgaard v. Montoya*, 2011 WL 5037223, at *7 (M.D. Fla. Oct. 24, 2011).

Here, A.D. repeatedly demonstrated an inability to meaningfully engage with the questions the district court posed. For example, when the district court asked A.D. whether she took any medication that would impact her ability to understand the proceedings or answer questions

honestly, A.D. said she did.  So the district court asked, "You want to tell me what that is, for the record?  Are you taking any medications?"  Then A.D. said she was not taking any.  Versions of this colloquy repeated themselves:  an answer given and then contradicted a moment later.

The district court asked A.D. about school.  A.D. delivered clipped responses.  "Q:  What do you like about school?  A:  Gym.  Q:  What classes do you like?  A:  Gym."  This held true for the rest of the interview:  A.D. would confirm a question and answer it with one word (even when the question was open-ended), without supplying any reasoning or explanation that would tend to show maturity.  She clearly did not engage meaningfully with the district court's questioning.[2]

Nor did A.D. demonstrate an understanding of the proceedings.  *Custodio v. Samillan*, 2015 WL 9477429, at *5 (E.D. Mo. Dec. 29, 2015), *aff'd*, 842 F.3d at 1087, 1092.  When the district court asked A.D. if she knew why she was talking to the court and if she knew what the case was about, A.D. answered yes to both at first.  But when the district court explicitly asked her what the case was about, A.D. said she did not know.  The district court inquired further, "So you don't understand it?"  A.D. said only, "Uh-huh."  This does not demonstrate a mature understanding of the proceedings.  *See Alvarez Romero v. Bahamonde*, 2020 WL 8459278, at *6 (M.D. Ga. Nov. 19, 2020) ("When asked if she knew why she was talking to a judge, [the child]

---

[2] The majority points to medical records from one visit that supposedly indicate "other adults have . . . described A.D. as sufficiently mature enough to be credible."  Those records state her vocabulary and attention are "age-appropriate"—that is, "congruent with her chronological age."  The majority does not tell us how these terms bear any weight in the Hague Convention context, and we know there is no age threshold for maturity.  Moreover, there is substantial reason to give little weight to this notation.  It comes from a Mental Health Advocate (MHA) who "observed the beginning" of the interview with the medical professional and further noted A.D. "appeared to engage easily with the interviewer and interacted congruent with her chronological age."  It does not appear that the MHA spent any individual time with A.D.  And the medical professional who actually examined A.D. contradicts the MHA's statements:  her notes indicate A.D. was "very nervous" and disengaged.

said that she was here for the court case and that the case was about whether she would be able to stay in America[.]"), *aff'd*, 857 F. App'x at 577.

The majority attempts to gloss over A.D.'s testimony by insisting that her "angst and ignorance to the legal implications of the interview are not dispositive," that the maturity inquiry is "fact-intensive," and that "we are limited to words on a transcript." But it is not just that A.D. could not explain why she was talking to the district court, could not describe what the case was about, and simply agreed that she did not understand the case. It is that she fundamentally lacked the maturity to follow or understand the questions the district court posed and the dispute over where she should reside.

A single inconsistency might be attributable to nerves, as the majority contends. But A.D. contradicted herself repeatedly and over the whole range of topics discussed, including medication, school, her understanding of the proceedings, and her memories of Haiti. Her recounting of the latter captures this well. A.D. first denied any memory of living in Haiti. Then she remembered the Jean-Louises raising her there. But when asked whether she remembered the Deravils, she said no—three times, to three separate questions—yet moments later remembered visiting the Deravils there during that same period. A mature child would have recognized such inconsistent reporting, which is a far cry from the "depth and breadth" other courts have found necessary. *See Sadoun*, 2016 WL 4444890, at *10.

2.

Maturity can also be shown by a child's ability to offer reasoned comparisons between life in the habitual residence and life in the new country. This involves recalling and narrating past events, offering comparisons between life in each country, and comparing her possible futures in both places rationally (not just emotionally). *Díaz-Alarcón*, 944 F.3d at 309 n.12. A child

22

demonstrates such maturity by elaborating when asked follow-up questions, explaining what happened in detail, and why she thinks she feels a certain way. *Blondin*, 238 F.3d at 166–67.

To test A.D.'s recall ability, the district court sought information about whether she remembered her trip to Ohio in July 2023 to visit the Jean-Louises. A.D. said she did. When asked her to share more about the trip, she said, "That was good." And when asked to explain what happened there, she said, "I don't know." The district court later asked A.D. what happened upon returning to Ohio after Ilyse took her to Florida in July 2023. A.D. answered the question with one word: "Good." This hardly demonstrates an ability to narrate, compare, and contemplate the long-term consequences of life in a new place—here, Ohio. *Swett v. Bowe*, 733 F. Supp. 3d 225, 271–73 (S.D.N.Y.), *aff'd sub nom.*, *Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024).

A.D.'s testimony about Legrand disciplining her with a stick also illustrates an inability to recall events in a mature way. A.D. confirmed that she sometimes got in trouble but did not remember what happened when this occurred, so the district court tried to probe. When asked whether someone tried to "hurt" or "bully" her, A.D. said "uh-huh," and then said it was Legrand. When asked how, she said it was "with a stick." We have no other details, save for similar testimony from Julmise and a January 2025 medical record in which A.D. provided a shifting narrative of the event. A child who cannot provide a comprehensive narrative has not demonstrated the capacity to recall, process, and reason from her own experience. *Cf. Romero*, 857 F. App'x at 577 (finding maturity after the child described a series of specific and disturbing events in detail). Nor do the incomplete narrative fragments that A.D. provided satisfy the grave-risk exception found in Article 13(b) of the Hague Convention. *See Betancourt Diaz v. Figueredo*, 2026 WL 105019, at *4 (N.D. Ga. Jan. 14, 2026) (rejecting the maturity defense where the child's

account was unreliable and rejecting the grave-risk defense because "occasion[al] physical[] or verbal[] discipline" did not subject her and her sibling to a grave risk).

This is not to minimize what A.D. may have experienced. Recounting abuse is difficult for anyone, especially for a child. Although the record tells us something may have occurred, and that it was difficult to recount, it also tells us that A.D. was unable to recall this experience in a mature way.

The district court also sought to assess A.D.'s ability to comparatively reason. Mature comparative reasoning occurs when a child can distinguish between life in the habitual residence and life in the new country, articulate what differs, explain why it matters, and do so with fairness toward both sets of caregivers and both countries. *See Romero*, 857 F. App'x at 583.

When the district court asked A.D. about how life in Ohio differed from life in Martinique, she said, "it was good." The district court asked again: Did she like one place better than another? "No." Then: Did she prefer one place over the other? "Yes." Contradictory answers to the same question asked two different ways. And when asked again which place she preferred, she said, "here," and then she said she felt "bad" about returning to Martinique. When asked why she did not miss the Deravils, she said she did not know.

A mature child can connect feelings to specific experiences, explain why those matter, and reasonably consider where she prefers to live. But A.D. could only provide one-word answers—yes, no, bad, good—which does not resemble analysis or reasoned comparison. And she provided only a limited discussion of her life in Martinique, which does not demonstrate maturity. *See De La Cruz v. Garcia*, 398 So. 3d 429, 434 (Fla. Dist. Ct. App. 2024) (holding that "generic and near-sighted responses" demonstrate an "inability to maturely comprehend . . . the long-term impact of her decisions"). Even when the district court asked A.D. more pointedly to "put some

meat on those bones—did anything bad happen to you in Martinique?"—A.D. just answered "no." The inability to answer with more than one word demonstrates cognitive and emotional immaturity, as does her limited ability to compare her life in the habitual residence to her life in the new country.

3.

Finally, for the third marker, we assess whether A.D. holds balanced views of the Jean-Louises and the Deravils, and whether they are her own. *Colon v. Mejia Montufar*, 470 F. Supp. 3d 1280, 1296 (S.D. Fla. 2020); *see also Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1126 (D. Colo. 2008) (finding the exception unestablished where the court could not determine whether the children's views were their own or the product of a parent's influence). When there is a lengthy period of wrongful retention, courts must be especially careful in this assessment. *Yang*, 499 F.3d at 280. A child can easily be influenced in such a situation, and the influence need not be deliberate. *McElligott v. McElligott*, 2023 WL 5932947, at *28–31 (D.N.J. Sep. 12, 2023) (finding undue influence where the child developed unbalanced views attributable to prolonged residence with the retaining parent). That is why district courts must offer detailed findings when concluding a child has views of her own, which the district court did not do here.

Here, the transcript reveals the following. A.D. had lived with the Jean-Louises for nearly two years by the time the district court interviewed her. A.D. said the Jean-Louises told her she should be in Ohio. A.D. reported that the Deravils "just steal me." And she stated the Jean-Louises did not know of the Deravils' plan to move from Haiti to Martinique when she was a toddler. But all of this mirrors the Jean-Louises' account of the events and thus, strongly indicates that they influenced her views, which the district court should have questioned further. *See Yang*, 499 F.3d at 279 n.20 (finding evidence of undue influence where the child's statement that "the 'best school is in Pittsburgh' was mere repetition of what [the retaining parent] told her"). After all, a child

who adopts a parent's characterization of disputed events as her own has not demonstrated independence and therefore lacks maturity.

In short, A.D. relayed only what the Jean-Louises told her about where she should live, their characterization of the Deravils, and their claim about what they did or did not know about relocating A.D. to Martinique. But she did not identify a single thing about life in Martinique that was good or bad, could not say why she did not miss the Deravils, and could not explain her own preference regarding where she wants to live.

The district court cast this evidence aside simply because it determined A.D. "confirmed that the Jean-Louises did not tell her what to say during the interview, that she did not feel pressured, and that her words were her own." But, again, A.D.'s self-reports are wholly unreliable. After all, she did not follow a substantial portion of the interview questions. And a child who cannot track the thread of her own answers is not a reliable reporter on whether someone else shaped her views. Making matters worse is that the district court's questions were leading: "Everything you're telling me is your own words, right?" "[N]ot someone speaking through you, right?" These questions encouraged A.D. to agree with the district court, which an immature child would easily do.

Finally, the district court's framing of the inquiry was too narrow. Whether a child was coached before the interview is not the only form of influence the Hague Convention contemplates. *See McElligott*, 2023 WL 5932947, at *31; *Aguilera v. De Lara*, 2014 WL 3427548, at *7 (D. Ariz. July 15, 2014) ("Such influence need not be intentional or sinister; it may simply result from the child's retention by one parent."). A.D. had lived exclusively with the Jean-Louises for two years, during which the Jean-Louises told A.D. she was stolen and kidnapped and should live in Ohio. This most certainly shaped the frame of reference through which A.D. understood the questions

the district court posed.  At the very least, the fact that the Jean-Louises had exclusive custody of A.D. for two years necessitated further findings by the district court.

In sum, A.D. failed to demonstrate the necessary maturity required under the Hague Convention.  She did not engage meaningfully with the district court's questions, contradicting herself repeatedly and responding almost exclusively in one-word answers; she could not offer reasoned comparisons between life in Martinique and life in Ohio or orient herself toward future consequences in either place; and she did not demonstrate that her views were her own rather than the product of two years of exclusive custody with the Jean-Louises.  The district court's findings to the contrary are not supported by the record and thus are clearly erroneous.

B.

Even if A.D. had demonstrated the requisite maturity, the exception would not apply because she did not articulate a particularized objection to returning to Martinique.  Particularized objections are specific, remain consistent across questioning, and are grounded in the child's own experience rather than in generalities.  *Dubikovskyy v. Goun*, 54 F.4th 1042, 1048–50 (8th Cir. 2022).

Here, A.D. said she preferred remaining in Ohio.  She said she felt "bad" about returning to Martinique because she did not feel safe or that she belonged there.  When the district court pressed for specifics, she said nothing bad had ever happened to her in Martinique, and she offered no explanation for why she did not miss the Deravils.  She offered, at most, the observation that she "do[es]n't like them."  None of this rises to the level of a particularized objection to returning to Martinique.

The testimony about the stick does not add any particularity either.  A.D. never connected the stick with her objection to return.  She did not say she feared she would be disciplined or threatened with it again.  And she did not link the past experience to any condition she expected

27

to face in Martinique in the future. A particularized objection requires that connection: the child must identify the condition and explain why returning to it is intolerable.

On the other hand, to the extent A.D.'s answers to questions about her life in Ohio can be construed as reasons for wanting to stay, they are merely preferences. She likes Ohio, has her own bedroom, and enjoys spending time with her friends and playing soccer at the park. But she also stated that she has friends in Martinique and played soccer there as well. Moreover, material comforts do not count as particularized objections to return. *Castillo v. Castillo*, 597 F. Supp. 2d 432, 441 (D. Del. 2009) (finding particularized objections when the child explained "that, in Colombia, she received little help with homework, performed poorly in school . . . , was often unable to play outside due to safety concerns, [and] spent much of her time at home alone"); *Romero*, 857 F. App'x at 583–84.

At bottom, A.D. did not articulate a particularized objection to returning to Martinique. Her feelings were neither specific nor consistent, nor were they grounded in entirely her own experience. Instead, they amount to a generalized preference for remaining in Ohio based on present comforts available in both countries. The Hague Convention requires the child to identify a condition in the country of habitual residence and explain why returning to it is intolerable, and that showing was not made here. Thus, on this record, the district court's findings in this regard were clearly erroneous.

## II.

A district court clearly errs when it makes findings of fact not in accord with the record. This is such a case. The district court clearly erred in finding that A.D. demonstrated sufficient maturity to invoke the exception to return and that she articulated a particularized objection to

28

returning to Martinique. Thus, the Hague Convention's default rule of return applies, not the narrow age-and-maturity exception invoked by the majority.

For these reasons, I respectfully dissent. I would reverse and remand with instructions to grant the Deravils' return petition.